*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0335P (6th Cir.)
File Name: 02a0335p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
      *Plaintiff-Appellant,*

    *v.*

SYLVESTER TOWNSEND and
DAVID GREEN,
      *Defendants-Appellees.*

No. 00-4608

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 99-00089—Walter H. Rice, Chief District Judge.

Argued: April 24, 2002

Decided and Filed: September 27, 2002

Before: KRUPANSKY and BOGGS, Circuit Judges; and
LAWSON, District Judge.*

_____

*The Honorable David M. Lawson, United States District Judge for the Eastern District of Michigan, sitting by designation.

1

_____

**COUNSEL**

**ARGUED:**    David J. Horne, ASSISTANT UNITED STATES ATTORNEY, Dayton, Ohio, for Appellant. Kevin M. Schad, SCHAD & COOK, Indian Springs, Ohio, Sharon L. Ovington, GREGER & OVINGTON, Dayton, Ohio, for Appellees. **ON BRIEF:** David J. Horne, ASSISTANT UNITED STATES ATTORNEY, Dayton, Ohio, for Appellant. Kevin M. Schad, SCHAD & COOK, Indian Springs, Ohio, Lawrence J. Greger, GREGER & OVINGTON, Dayton, Ohio, for Appellees.

_____

**OPINION**

_____

BOGGS, Circuit Judge.   The United States appeals the district court's order suppressing evidence and dismissing the indictment obtained against Sylvester Townsend and David Green.  During a traffic stop, Ohio state patrolmen called for a drug-sniffing dog and then searched the trunk of the car in which the defendants were traveling.  The district court held that, while the traffic stop was permissible, the detention of the automobile and the two defendants until the canine unit arrived, but beyond the time reasonably necessary to issue a traffic citation, was without reasonable suspicion and in violation of the Fourth Amendment.  According to the district court, the invalid detention tainted the search and the evidence seized in the search was inadmissible.  For the following reasons, we affirm the district court's judgment.

**I**

In the early morning hours of June 16, 1999, Ohio highway patrolmen Douglas Eck and John Chesser stopped an automobile traveling Eastbound on Interstate 70 in excess of the speed limit.  The officers testified that, from the beginning of the stop, they found several things unusual.  As they

approached the vehicle, Townsend, who had been driving the car, put his hands in the air without prompting. When told that the radar indicated that they had been speeding at 76 MPH, Townsend immediately admitted that he had been traveling at 85. Townsend had his license, registration, and proof of insurance ready when Officer Eck arrived at his window. Officer Eck testified that he found this behavior reflective of an unusual eagerness to end the stop quickly.

Officer Eck returned to his patrol car, where another officer, James Myers, had arrived. At the suppression hearing, the three officers testified that the defendants acted nervously in the car, frequently looking back at the officers while they were processing the paperwork. Although Townsend's name matched the name listed on the proof of insurance for the car, the registered owner was different. Eck returned to the car and asked Townsend whether the owner of the automobile was present. Townsend said no. As it turns out, the car was registered to Townsend's mother. At the suppression hearing, Eck testified that he found the absence of the record owner suspicious as drug couriers often do not own the cars that they are driving.

Eck then questioned Townsend and Green regarding the purpose of their journey. Townsend claimed that they were traveling from Chicago to visit his sister in Columbus. Townsend said that he could not remember his sister's address in Columbus, but claimed that he had planned to call his sister once he reached the Columbus area. At the suppression hearing, Eck testified that he believed Townsend to be lying regarding the purpose of his journey, as he found it odd that Townsend had planned to call his sister in the early morning hours. Eck also testified that he believed Chicago to be a source city and Columbus a destination city for narcotics. The defendants' traveling between those destinations made Eck suspect that the defendants were transporting drugs, Eck testified.

The officers observed three cellular telephones and a Bible in the passenger compartment. According to Eck, the large

number of cellular telephones were typical of drug couriers. In addition, Eck testified that, in his experience, drug couriers often prominently display religious symbols in their cars in order to deflect suspicion of drug smuggling.

The officers asked the defendants to exit their vehicle and frisked the defendants for weapons. The officers found no weapons on the defendants, but did detect what felt like a large roll of cash. According to Eck's testimony, he knew that drug couriers, engaging in a largely cash-based business, often carried large amounts of currency. The officers also searched the passenger compartment for weapons, but found none.

Finding no contraband in the passenger area of the car or on the person of the defendants, the officers ordered the defendants to sit in the back of the patrol car and called for a canine unit. Over thirty minutes later, another officer arrived with a drug-sniffing dog. The dog alerted on the trunk of the car. Because of the dog's indication, the officers opened and searched the trunk. They found nothing in the main luggage compartment of the trunk. The officers also dismantled a compact-disc-changer mechanism that was in the back of the trunk. Lodged inside the device were ten, apparently counterfeit, one-hundred dollar bills. The officers never found any trace of narcotics of any kind in the trunk. The officers arrested the defendants for possession of counterfeit currency.

The United States Attorney obtained indictments against the defendants for possession of counterfeit currency, in violation of 18 U.S.C. § 472. The defendants moved to suppress the ten counterfeit bills seized during the officers' search of the trunk, arguing that the search violated the Fourth Amendment. The district court conducted an evidentiary hearing and granted the defendants' motion. For the district court, the defendants' motion presented three distinct questions: whether the officers (1) had probable cause to believe a traffic violation was occurring to make the initial stop; (2) had reasonable suspicion of more extensive criminal

the officers, drug couriers often drive other people's cars to avoid forfeiture of their own property. In this case, the car was not completely unrelated to the defendants. The proof of insurance card listed Townsend as covered on the automobile and the record owner of the car was Townsend's mother. Again, the suspiciousness of this particular feature is comparatively weak in this case.

### III

Although the government has pointed to several factors, present in this case, which we have recognized as valid considerations in forming reasonable suspicion, they are all relatively minor and, in many cases, are subject to significant qualification. The fact of the matter is that this case lacks any of the stronger indicators of criminal conduct that have accompanied these minor factors in other cases. We hold that the officers lacked reasonable suspicion to detain the defendants until the canine unit arrived. We, therefore, AFFIRM the district court's order suppressing the counterfeit bills seized in the officers' search of defendants' trunk and dismissing the indictment.

often carry large amounts of currency, amounts indicative of criminal activity would likely be more than 25 $1 or $10 bills, which, for all this court knows, is all that the defendants were carrying.

Seventh, the officers testified that they learned that Townsend had been previously arrested on a weapons charge. The government argues that the officers, due to the weapons charge, reasonably feared for their safety and were entitled to search the passenger compartment and the defendants for weapons. We agree with the government: certainly the prior weapons arrest would contribute to probable cause to search the defendants and the passenger compartment. The officers, in this case, did so and found nothing. Once the officers had satisfied themselves that there were no available weapons, the arrest (without even a conviction) would carry very little weight in providing reasonable suspicion of more extensive criminal activity at the time of the stop.

Eighth, the officers claimed that the defendants appeared nervous, repeatedly looking back at the patrol car, while the officers were processing paperwork for the citation. The district court found the officers' accounts regarding defendants' demeanor inconsistent and not credible. This is a finding of fact, which we may only overturn if clearly erroneous. The government has provided this court with no basis to overturn the district court's finding.

Ninth, the officers contended that the interior of the automobile was cluttered with food wrappers and clothing, indicating that the defendants had been reluctant to leave the car and their suspected load of cocaine. The district court did not address this factor at length. The officers testified that there were clothing and food wrappers in the car. However, it is not as if the defendants would have had to live in the car for days to drive from Chicago to Columbus. Given the context, the unkempt condition of the car is not terribly suspicious.

Tenth, the officers noted that they were concerned that the driver was not the registered owner of the car. According to

activity sufficient to justify the continued detention of the defendants beyond the time reasonably necessary to issue the traffic citation; and (3) had probable cause to search the trunk. According to the court, the officers clearly had probable cause to believe that the defendants were speeding, validating the initial stop. The court held, however, that the officers lacked the reasonable suspicion required to detain the defendants and their car beyond the time reasonably necessary to issue the traffic citation. This invalid detention, according to the court, provided the officers with sufficient time for the canine unit to arrive. Without the dog's alerting on the trunk, made possible by the invalid detention, the officers would not have had probable cause to search the trunk. Accordingly, whatever the validity of the search with the information provided by the drug-sniffing dog, the district court held that the invalid detention tainted the search and, therefore, suppressed the counterfeit currency.

The government conceded that it lacked sufficient evidence, without the currency, to maintain the charges against the defendants and the indictment was dismissed by the court. The government now appeals the district court's order holding the officers' investigatory detention, and subsequent search, invalid under the Fourth Amendment and excluding from evidence the ten counterfeit bills seized during the search.

## II

A police officer may effect a traffic stop of any motorist for any traffic infraction, even if the officer's true motive is to detect more extensive criminal conduct. *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995). To detain the motorist any longer than is reasonably necessary to issue the traffic citation, however, the officer must have reasonable suspicion that the individual has engaged in more extensive criminal conduct. That is, without such reasonable suspicion, all the officer's actions must be "reasonably related in scope to circumstances justifying the original interference." *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999).

The reasonable suspicion required for continued investigatory detention is not as demanding a standard, however, as the probable cause required for the ultimate search. None of the parties disputes that the officers in this case validly effected the initial stop, or even that they had probable cause for the search of the trunk after the drug-detecting dog had alerted to the trunk. The sole question in this case is whether the officers had the reasonable suspicion necessary for the continued investigatory detention of the defendants, a detention that permitted the canine unit to arrive and that created the probable cause that would otherwise justify the search.

The district court determined that the officers lacked such reasonable suspicion. With regard to some of the officers' claimed reasons for suspecting the defendants of criminal activity, the district court held that they were not sufficiently significant as a matter of law. With regard to others, the district court simply did not believe that the officers relied on the factor. The district court's reasoning requires that this court carefully examine the applicable standard of review. As with most lower court determinations, findings of fact are reviewed for clear error and propositions of law *de novo. See, e.g., United States v. Myers*, 102 F.3d 227, 231 (6th Cir. 1996) (reciting this formula in the probable cause context). The "reasonable suspicion" determination is ultimately a mixed question of law and fact (or, in other words, an application of law to fact), by which the court determines whether the facts surrounding the officer's determination are of sufficient legal significance to constitute reasonable suspicion. Accordingly, the application of the legal principles surrounding the nature of reasonable suspicion to the facts observed by an officer is reviewed *de novo* by this court, as mixed questions of law and fact typically are. *Ornelas v. United States*, 517 U.S. 690, 697 (1996) (clarifying that the ultimate reasonable suspicion determination is subject to *de novo*, rather than abuse of discretion, review).

In determining the events leading up to the action requiring reasonable suspicion, courts will be called upon to make

court held that cellular telephones cannot, in any way, contribute to reasonable suspicion. The government's reading of the district court's opinion is aggressive. The district court held that cellular telephones are so much more common today than in 1992, when they were considered "tools of the drug trade," *United States v. Slater*, 971 F.2d 626, 637 (10th Cir.1992),[2] that they are considerably less suspicious. Three cell phones in one car does seem slightly odd, and we are certainly not prepared to hold that the presence of several cell phones cannot contribute to reasonable suspicion of criminal activity. This factor, however, is weak and is not accompanied in this case by more substantially suspicious factors.

Fifth, the officers claimed that the presence of a Bible in the car was suspicious because drug couriers often display religious symbols to deflect suspicion of illegal activity. In *United States v. Ramon*, 86 F. Supp. 2d 665, 675 (W.D. Tex. 2000), the defendants had displayed several religious decals on the back of the car, which officers felt was an attempt to avoid police attention. The district court there did not hold that reliance on such a factor was completely invalid, although it noted that it was a very weak indicator of criminal activity. *Ibid.* Here, having a Bible inside the car appears even further from a deliberate plan to throw police off the scent. We agree with the district court that the Bible, in this case, is a very weak indicator of criminal activity.

Sixth, the officers, while frisking the defendants, felt what appeared to be rolls of currency in each of their pockets. There is no evidence in the record about how much currency the defendants were carrying, or that the officers ever ascertained that fact. The district court determined that the record was simply too thin on the amount of money that was on the defendants' person to assess whether it was probative of criminal activity. We agree. Although drug dealers do

---

[2] *But see United States v. Hernandez-Dominguez*, 1 Fed. Appx. 827, 831 (10th Cir. 2001) (recognizing the diminished probative value of cell phones).

officer had no articulable reason to suggest that people do not generally undertake such journeys. The closest that the officer comes is suggesting that the trip was occurring at the middle of the night. However, we have never suggested that late-night travel is inherently suspicious. The defendants' story in this case lacks the indicia of the untruthfulness that we have held particularly suspicious in the past.[1]

Third, the officers claimed that they were concerned because the defendants were traveling from a source city for narcotics, Chicago, to a destination city for narcotics, Columbus. The district court determined that the officers' analysis was makeweight. There were simply too many source and destination cities, according to the district court, to make the entirely common trip from Chicago to Columbus suspicious. We agree that a Chicago-to-Columbus trip does not bear the suspicion that the officers seek to attach. We are far from the situation in *United States v. Arvizu*, 122 S.Ct. 744 (2002), in which the defendants were traveling on an infrequently used road, directly from the Mexican border, when a paved, but more patrolled, highway was available. Those circumstances, with others, provided reasonable suspicion for investigative detention. *Id.* at 751. While it would be erroneous to hold that the defendants' travel plans are not suspicious simply because they are less odd than those in *Arvizu*, *see United States v. Knights*, 122 S. Ct. 587, 590 (2001), we simply note that traveling from Chicago to Columbus, two large, mutually proximate Midwestern cities, is a more common occurrence.

Fourth, the officers claimed that the presence of three cellular telephones in the passenger compartment was typical of drug couriers. The government argues that the district

---

[1] Although this type of *ex post* reasoning should not be the basis for decision, we note that there is no evidence in the record that the defendants were not, in fact, traveling to visit Townsend's sister. At the suppression hearing, Townsend testified that he had actually said he was going to visit "the sisters" rather than "his sister," making his failure to remember "his sister's" address less odd.

several findings of historical fact, which must be reviewed only for clear error. *See id.* at 699. One such necessary historical fact is extensively at issue in this case. The court cannot determine that an officer had reasonable suspicion on the basis of a factor on which the officer did not actually rely. *United States v. Lott*, 870 F.2d 778, 783-84 (1st Cir. 1989). With regard to several proferred explanations for the detention, the district court did not believe an officer's statement that he found a particular feature of the stop or the defendants suspicious at the time or even that a particular event had occurred. These credibility assessments are findings of fact, which this court cannot overturn unless clearly erroneous.

More generally, even the application of the legal principles governing reasonable suspicion to the facts is subject to some deference. As we have repeatedly recognized, the concepts of "reasonable suspicion" and "probable cause" do not permit of precise judicial definition and are dependent on circumstances. *Ornelas*, 517 U.S. at 695-96 ("Articulating precisely what 'reasonable suspicion' and 'probable cause' mean is not possible. They are commonsense, nontechnical conceptions that deal with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. As such, the standards are 'not readily, or even usefully, reduced to a neat set of legal rules.'"). Although the standard of review on the ultimate reasonable suspicion inquiry is *de novo*, the district court is at an institutional advantage, having observed the testimony of the witnesses and understanding local conditions, in making this determination. Accordingly, "due weight" should be given to the inferences drawn from the facts by "resident judges." *Id.* at 698.

As a formal matter at least, it appears that the district court appropriately evaluated the totality of the circumstances in making its reasonable suspicion determination and did not, contrary to the government's suggestion, simply hold that each of the officers' reasons *seriatim* would not provide reasonable suspicion. JA at 527 ("In sum, the Court cannot

find that the factors relied upon by the Government, considered individually or together, established reasonable suspicion . . . ."). The United States essentially commits the same fallacy for which it criticizes the district court by citing to us case after case where each of the factors on which the officers in this case claimed to rely has been considered as probative of the reasonable suspicion, but in the context of other factors not present in this case. The Supreme Court has recognized that, in the course of adjudicating "reasonable suspicion," "one determination will seldom be a useful 'precedent' for another." *Illinois v. Gates*, 462 U.S. 213, 238 n.11 (1983). We are charged to determine whether the *combination of factors* considered by the officer is sufficient for reasonable suspicion. We consider chronologically the factors cited by the officers below.

First, the officers claimed that the defendant's behavior at the car was unusual. Townsend immediately raised his hands in the air as the officers approached the car. Yet, the district court noted that Officer Eck had only testified that he found the hands raised in the air unusual and did not offer testimony that, in his experience, such an action is linked to more extensive criminal activity. Our review of the record indicates that the court was correct to find this factor unrevealing of reasonable suspicion in the absence of testimony about the activity's linkage to criminal conduct.

The officers also claimed that Townsend was unusually cooperative when the car was initially stopped. Townsend had his license, registration and proof of insurance ready when Eck approached the car. Moreover, Townsend volunteered that he had been traveling at 85 MPH, after the officer said that he had been clocked at 76 MPH. Eck testified that drivers typically lie about their speed, or at least do not confess to a higher speed, and that Townsend's charitable stipulation was reflective of someone who wanted quickly to terminate his interaction with the police. The government does not appear even to raise the significance of this factor in arguing that the district court erred. To the extent that factor is raised, the district court did not find Eck's

statement regarding the significance of the cooperation credible. This credibility finding by the district court is entitled to substantial deference. The district court also suggested that many drivers, stopped at 3:00 AM, would seek quickly to end the stop by cooperating. The district court's behavioral prediction is not erroneous. Townsend's cooperation appears a very weak indicator of criminal conduct, indeed.

Second, the officers claimed that the defendants produced dubious travel plans. According to the officers, Townsend and Green claimed that they were traveling from Chicago to Columbus to visit Townsend's sister. According to Officer Eck, the time of the stop and the defendants' approximate speed would have put Townsend in Columbus between 4:00 and 5:00 AM. Townsend also did not know his sister's address, but claimed that he had planned to call her once he reached Columbus. Townsend's plans were so improbable to be likely false and attempts to hide criminal plans, Eck testified.

The government argues that we have repeatedly recognized that lying about travel plans can form the basis for reasonable suspicion. And the government is undoubtedly correct. In *United States v. Hill*, 195 F.3d 258 (6th Cir. 1999), this court determined that the defendants' far-fetched story about the reason for their journey was grounds for reasonable suspicion. There, the defendants claimed to have been assisting their sister, who had been transferred by the military, to move her belongings in the U-Haul that they were driving. *Id.* at 272. As it turns out, the truck was full of cocaine. The officer testified that it was his understanding that the military typically moved its members in the event of a transfer. *Ibid.* More important in that case was that the passengers of the car told inconsistent stories regarding the purpose of the trip. *Ibid. See also United States v. Johnson*, 58 F.3d 356, 357-58 (8th Cir. 1995) (where doubt regarding expressed travel plans was bolstered by passengers' inconsistent statements). In this case, both of the defendants claimed that they were traveling to Columbus to visit Townsend's sister. Moreover, the