NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0847n.06

No. 11-3091

**FILED**

**Dec 15, 2011**

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellee, | ) | UNITED STATES DISTRICT |
| | ) | C O U R T   F O R   T H E |
| v. | ) | NORTHERN DISTRICT OF |
| | ) | OHIO |
| Jeffrey A. Samuels, | ) | |
| | ) | O P I N I O N |
| Defendant-Appellant. | ) | |

BEFORE:    MOORE, CLAY, and McKEAGUE, Circuit Judges.

**McKeague, Circuit Judge.**  Defendant-Appellant Jeffrey A. Samuels ("Samuels") was convicted of being a felon in possession of a firearm.  He appeals the district court's denial of his motion to suppress, arguing that he was stopped by police without reasonable articulable suspicion of criminal activity and that the stop exceeded its proper scope.  We **AFFIRM**.

### I.  Background

On March 14, 2010, Ohio State Patrol Trooper Daniel Jesse ("Trooper Jesse" or "Jesse") was patrolling westbound on Interstate 76 in the Portage County area in northeastern Ohio.  He noticed a blue Chevy Tahoe with darkly tinted windows merge onto the highway, parallel to him.  Under Ohio law, a vehicle's front windows must allow at least 50% light through.  Ohio Admin. Code § 4501-41-03(A)(3).  It was "blatantly obvious" to Jesse that the Chevy's front windows were not letting enough light through.  He testified that as the vehicle approached the end of the ramp, pulling

even with his marked cruiser, the driver appeared to notice him and began to "drastically slow down and drop down behind me," even though Trooper Jesse was going the posted speed limit of 65 miles per hour. He acknowledged that a driver may create distance from a marked police vehicle in an effort to avoid receiving a speeding ticket. Jesse pulled into the marked crossover, allowed the vehicle to pass, and then pulled out and initiated a traffic stop based on the suspected window tint violation. Samuels was the driver and sole occupant of the vehicle. The encounter was captured on video by a camera mounted on Trooper Jesse's vehicle.

At approximately 1:43 p.m., Trooper Jesse approached the vehicle from the passenger side. He advised Samuels that he was being stopped for a window tint violation and asked Samuels for his license, registration, and insurance, which Samuels produced. Trooper Jesse testified that Samuels seemed very nervous—he was sweating, his hands were shaking, and he was breathing at an elevated rate. Jesse also noticed that the vehicle was repainted, the interior seemed mismatched, and electronic controls were hanging out of the dashboard as if items from the dash had been removed. Jesse asked Samuels what was going on with the vehicle, and Samuels informed him that the vehicle had been repainted and had previously been broken into. Jesse then tested the window tint with a tint meter and informed Samuels that his windows allowed 9% light to go through, meaning they were 91% tint.

At 1:48 p.m., Trooper Jesse said to Samuels, "Give me a few minutes, just sit tight for me, let me check some stuff out, I'll be back up with you shortly." Jesse testified that writing a citation for a window tint violation involved "run[ning] the driver's information, either license or social security number, through the computer system, run[ning] the registration, [and] do[ing] a warrants

check on him." Trooper Jesse then moved over to the driver's side of the vehicle to check the public vehicle identification number (VIN), which is typically located on the driver's side of the dashboard. Jesse testified that he typically checks the public VIN to make sure it matches the registration. The VIN on the vehicle matched Samuels' registration. Trooper Jesse testified that even if the public VIN matched the registration paperwork, it did not necessarily mean that the vehicle was not stolen. He also testified that he noticed the VIN plate had tool marks on it and one of the rivets was not seated properly, as if it had been tampered with. He opened the driver's side door to look at the federal identification label (FID), located in the driver's side doorjamb. Jesse testified that the FID label had been painted over and that the couple VIN numbers he could make out did not match the public VIN on the dashboard. At some point during the stop, Jesse confirmed that the vehicle's license plate information matched the vehicle and was registered to Samuels.

At 1:49 p.m., Trooper Jesse called for back up. He testified that he did so for safety reasons and to get another officer's help in identifying the vehicle. Specifically, he wanted to look for secondary VIN numbers—which are hidden in various locations and change depending on the make, model, and year of the vehicle—to make sure the car was not a stolen vehicle that had been retagged with a good VIN. Jesse also testified that the appearance of the vehicle's interior was consistent with vehicles he had interdicted in the past for drug trafficking, which had parts of the vehicle removed to make hidden compartments for contraband. Trooper Jesse requested his direct sergeant or Trooper Michael Landers ("Trooper Landers" or "Landers") and Landers responded. Jesse was aware that Landers had a drug-sniffing canine with him.

At 1:52 p.m., Trooper Landers arrived. Trooper Jesse testified that, in the meantime, he had been writing a ticket for the window tint violation. Jesse told Landers, "I called for you or 571 but I was kinda hoping you were gonna come anyway, I'm gonna have you try to walk the dog around it . . . he's nervous." Jesse also informed Landers that the FID had been painted over, the interior of the car was mismatched and the dash was pulled out, and he wanted to make sure "everything is kosher with the vehicle." Trooper Landers approached Samuels and, after an exchange, Samuels exited the vehicle. After another exchange, Trooper Landers frisked Samuels and then placed him in the back of Trooper Jesse's squad car.

The troopers then searched the vehicle for six minutes. The officers popped and looked under the hood of the car, and one trooper entered the car and sat in the driver's seat while the other appeared to stand on the hood. The search was limited to areas that might contain secondary VINs, and the troopers did not notice the smell or presence of marijuana at that time. Jesse stated that the search did not turn up any numbers needed to confirm the identity of the vehicle and that the next step would have been to tow the vehicle to the station where a specially trained detective would inspect the vehicle for hidden VINs.

At 2:04 p.m., after the officers had finished searching the vehicle for secondary VINs, Trooper Landers retrieved his drug detection dog, Hondo, and performed a dog sniff of the car while Trooper Jesse watched traffic. On Hondo's second time around the car, he alerted to the presence of narcotics around the gas tank cover. The dog sniff took a little less than two minutes, and the duration of the stop, from the initial seizure until the dog alert, was 23 minutes.

After the positive alert, Trooper Landers advised Samuels of his *Miranda* rights and the troopers searched the entire vehicle for contraband. The troopers found marijuana shave (seeds, stems, and bits of leaf) throughout the vehicle, baggies with marijuana residue on the front floorboards, and a .22 caliber Smith & Wesson handgun in the lining of the center console. Samuels was then placed under arrest based on the gun. Jesse testified that a person is typically not charged for possession of marijuana shave or residue. The vehicle was eventually towed to the station where a detective examined it for secondary VINs and confirmed that the vehicle was not stolen.

On August 3, 2010, Samuels was indicted of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Samuels filed a motion to suppress, and on October 28, 2010, the district court held a suppression hearing at which Troopers Jesse and Landers testified and a video of the traffic stop was played. The court then denied the motion in a ruling from the bench.

The court found that Trooper Jesse's credibility had not "sufficiently been put in question" and that the initial stop based on the window tint violation was justified. The Court also found that Trooper Jesse had reasonable and articulable suspicion of criminal activity to expand the stop beyond the scope of the window tint violation and that he did not need to have reasonable articulable suspicion that narcotic distribution or trafficking was afoot. Finding the expanded stop justified, the court then determined that the length and intrusiveness of the investigative stop up to the point of the dog's positive alert was reasonable. Lastly, the court found that the dog alert provided sufficient probable cause to justify the vehicle search that led to the discovery of the gun.

After his motion was denied, Samuels withdrew his plea of not guilty and entered a guilty plea, reserving the right to appeal the denial of his motion to suppress. On January 21, 2011, the

district court sentenced Samuels to 27 months imprisonment, followed by two years of supervised release, and imposed a $100 special assessment. On appeal, Samuels raises two arguments. First, he argues that the expansion of the stop to include identification of the vehicle was not justified by reasonable suspicion. Second, he argues that even if the expanded stop were justified, calling for the assistance of a drug dog was not reasonably related in scope to identifying the vehicle.

## II. Analysis

### A. Standards of Review

We review a district court's factual findings on a motion to suppress for clear error and its legal conclusions *de novo*. *United States v. Lattner*, 385 F.3d 947, 952 (6th Cir. 2004). The existence of reasonable suspicion is a mixed question of law and fact involving "the application of the legal principles surrounding the nature of reasonable suspicion to the facts observed by an officer" and is reviewed *de novo*. *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002) (citing *Ornelas v. United States*, 517 U.S. 690, 697 (1996)). However, we give "due weight" to the inferences drawn from the facts by district judges, who are at an institutional advantage in observing the testimony of witnesses and understanding local conditions. *Id.* at 542 (quoting *Ornelas*, 517 U.S. at 699). Whether the ensuing seizure was reasonable under the Fourth Amendment is a question of law that we review *de novo*. *United States v. Blair*, 524 F.3d 740, 747 (6th Cir. 2008) (citing *United States v. Galloway*, 316 F.3d 624, 628 (6th Cir. 2003)). When a district court denies a motion to suppress, we consider the evidence in the light most favorable to the Government. *U.S. v. Pearce*, 531 F.3d 374, 379 (6th Cir. 2008).

**B. Reasonable Suspicion**

"An ordinary traffic stop by a police officer is a 'seizure' within the meaning of the Fourth Amendment." *Blair*, 524 F.3d at 748 (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). "An officer may stop and detain a motorist so long as the officer has probable cause to believe that the motorist has violated a traffic law." *United States v. Bell*, 555 F.3d 535, 539 (6th Cir. 2009) (citing *Blair*, 524 F.3d at 748). "To detain the motorist any longer than is reasonably necessary to issue the traffic citation . . . the officer must have reasonable suspicion that the individual has engaged in more extensive criminal conduct." *Townsend*, 305 F.3d at 541.

This Court has held that a traffic stop "is more akin to an investigative detention rather than a custodial arrest, and the principles announced in *Terry v. Ohio*, 392 U.S. 1 (1968), apply to define the scope of reasonable police conduct." *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999). "In evaluating the constitutionality of a *Terry* stop, we engage in a two-part analysis of the reasonableness of the stop. We first ask whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to reasonable suspicion. In answering this question, we examine the totality of the circumstances to determine the reasonableness of the investigatory stop." *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005) (internal quotations and citations omitted). Thus, in order for Samuels' detention to have lawfully gone beyond the scope and duration necessary to issue a citation for tinted windows, the troopers must have adduced reasonable suspicion that he had engaged in "more extensive criminal conduct" than just the tinted window violation. *Townsend*, 305 F.3d at 541 ("That is, without such reasonable suspicion, all the officer's actions must be 'reasonably

related in scope to circumstances justifying the original interference.'" (quoting *Hill*, 195 F.3d at 264)).

Samuels does not contest the validity of the initial traffic stop based on the window tint violation but argues that the expanded scope of the stop to include identification of the vehicle was unjustified. Trooper Jesse acknowledged that once he noticed that the VIN had possibly been tampered with and that the FID label had been painted over, he expanded the stop to encompass identification of the vehicle. The district court found that Trooper Jesse had reasonable suspicion of more extensive criminal conduct that justified going beyond the routine checking of windows, driver's license, and registration based on the following factors: (1) the defendant slowed down and fell behind in what the court considered "a dramatic fashion, to the point where the trooper had to pull over and wait for him basically to catch up"; (2) the windows were heavily tinted, which "certainly could be indicative of a desire to hide something or someone"; (3) the dashboard appeared to have unattached or falling-out electronic controls; (4) the interior was mismatched; (5) the exterior had been repainted; (6) the VIN plate appeared to have been tampered with; (7) the FID number was partially painted over and did not match the VIN number; and (8) the defendant was "nervous, breathing heavily, and sweating on a 50-degree day."

Samuels first argues that factors (6) and (7) should not be considered in the reasonable suspicion analysis because once Officer Jesse tested the opacity of the windows and told Samuels to give him a few minutes, the purpose of the initial stop—the window tint violation—had ended. This argument is without merit. Trooper Jesse testified, and we find no reason to doubt, that writing a citation for a window tint violation involved "run[ning] the driver's information, either license or

social security number, through the computer system, run[ning] the registration, [and] do[ing] a warrants check on him." Thus, it is clear that even after Trooper Jesse tested the windows, the purpose of the initial stop had not ended.

Samuels also seems to argue that even if the purpose of the window tint violation had not ended, Trooper Jesse's conduct in moving over to the driver's side of the vehicle to view the VIN unlawfully expanded the stop because it was not independently supported by reasonable suspicion of criminal activity. While it is true that "[a] stop may be unlawfully extended beyond the initial purpose even if the officer never formally completes the citation," *Bell*, 555 F.3d at 541, the Supreme Court has concluded that "a demand to inspect the VIN, like a demand to see license and registration papers, is within the scope of police authority pursuant to a traffic violation stop." *New York v. Class*, 475 U.S. 106, 115 (1986). The *Class* Court also held that there is no expectation of privacy in a VIN, especially considering that federal law requires the VIN to be clearly visible from the outside. *Id.* at 114; *see* 49 C.F.R. § 565.13(e)-(f). As viewing a VIN neither unlawfully extends a lawful traffic stop nor intrudes upon a protectible Fourth Amendment interest, such action need not be supported by reasonable suspicion. *United States v. Ellison*, 462 F.3d 557, 560 (6th Cir. 2006) ("[T]he State's intrusion into a particular area . . . cannot result in a Fourth Amendment violation unless the area is one in which there is a 'constitutionally protected reasonable expectation of privacy.'" (quoting *Class*, 475 U.S. at 112)) (alteration and omission in original). The district court properly considered factors (6) and (7) in its reasonable suspicion analysis.

Samuels next attempts to discount the significance of factors (1), (3), (4), and (5) by pointing out that he had offered a reasonable explanation for each. The Supreme Court, however, has made

clear that factors consistent with innocent travel can, when taken together in a "totality of the circumstances" analysis, give rise to reasonable suspicion warranting further investigation. *United States v. Arvizu*, 534 U.S. 266, 274 (2002). While the probative value of innocent-seeming factors will depend on the particulars of each case, courts are not prohibited from considering them merely because they are susceptible to an innocent explanation. *See id.* at 275–78; *see also United States v. Orsolini*, 300 F.3d 724, 728 (6th Cir. 2002) ("This court has held that 'reasonable suspicion can be based on a totality of circumstances, no one of which standing alone would create a reasonable suspicion.'" (quoting *United States v. Anderson*, 923 F.2d 450, 455 (6th Cir. 1991))) (internal alteration omitted). Accordingly, the district court properly considered factors (1), (3), (4), and (5).

Based on the totality of the circumstances, we find no error in the district court's determination that Trooper Jesse had sufficient reasonable suspicion to go beyond the window tint violation. Here, the plate containing the public VIN appeared to be tampered with, which, according to Jesse's testimony, indicated criminality because stolen vehicles often have their original VIN plates removed and good VINs attached. *Cf. United States v. Caro*, 248 F.3d 1240, 1246 (10th Cir. 2001) (holding that an officer may not extend the scope of a detention where the VIN is readable from the outside of a vehicle, the "VIN matches the VIN listed on the registration, *and there are no signs the plate has been tampered with*") (emphasis added). Further, the fact that the FID label had been obscured and did not match the public VIN heightened the suspect nature of the vehicle. These, in addition to the condition of other parts of the vehicle and Samuels' behavior, sufficed to detain Samuels beyond the time reasonably necessary to issue a window tint violation while Officer Jesse conducted a limited investigation. We note, however, that factors such as a person's nervousness

or slowing down upon sighting a police vehicle on a major interstate highway, while part of the reasonable suspicion analysis, are given little weight. *See, e.g.*, *Arvizu,* 534 U.S. at 275–76 (noting that slowing down, stiffening of posture, and failure to acknowledge a sighted law enforcement officer "might well be unremarkable" on a busy highway); *United States v. Urrieta*, 520 F.3d 569, 577 (6th Cir. 2008) (noting that this court "has found nervousness inherently *unsuspicious*"); *United States v. Richardson*, 385 F.3d 625, 630–31 (6th Cir. 2004) (noting that nervousness "is an unreliable indicator, especially in the context of a traffic stop" because "[m]any citizens become nervous during a traffic stop, even when they have nothing to hide or fear").

## C. Scope and Duration of the Seizure

Having determined that the officer had reasonable suspicion to expand the traffic stop, we turn to the next question under the *Terry* analysis: "whether the degree of intrusion was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and surrounding circumstances." *United States v. Torres-Ramos*, 536 F.3d 542, 551–52 (6th Cir. 2008) (quoting *United States v. Caruthers*, 458 F.3d 459, 464 (6th Cir. 2006)) (internal alterations omitted). "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer*, 460 U.S. 491, 500 (1983). "While there is 'no rigid time limitation on the lawfulness of a *Terry* stop,' we must 'examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their

suspicions quickly, during which time it was necessary to detain the defendant.'" *Davis*, 430 F.3d at 354 (quoting *Orsolini*, 430 F.3d at 730).

Samuels does not contest that any aspect of the six-minute search for secondary VINs was unreasonable. He argues only that the use of a drug-sniffing canine was not reasonably related in scope to the justification for his continuing detention—i.e., the identification of the vehicle.

It is well established that the use of a "well-trained narcotics-detection dog . . . during a lawful traffic stop[] generally does not implicate legitimate privacy interests." *Illinois v. Caballes*, 543 U.S. 405, 409 (2005). However, a seizure may not be unreasonably prolonged in order to enable the canine sniff to occur. In such cases, the use of the drug dog and any subsequent discovery of contraband would be the product of an unconstitutional seizure. *Id.* at 407–08.

Here, the canine sniff occurred after the Troopers Jesse and Landers searched the vehicle for secondary VINs and could not find anything with which they could confirm the identity of the vehicle. The Government argues that the troopers' actions did not improperly extend the duration of the stop to enable the dog sniff because the VIN issue had not yet been resolved.

We need not reach this argument, however, because we find that the factors comprising reasonable suspicion in this case were sufficient to support the additional minute and a half it took the troopers to confirm or dispel their suspicion that the vehicle contained contraband. Here, significantly, Trooper Jesse testified that the interior of the car seemed mismatched, as it "did not appear to flow with what would have been factory in that vehicle," and electronic controls were unattached and falling out of the dashboard. He further testified that such signs comported with vehicles he had interdicted for drug trafficking in the past, which have had hidden compartments in

places like the stereo or heater units underneath the dashboard. We, as well as our sister circuits, have found that signs that a vehicle's configuration has been altered can contribute to reasonable suspicion of illegal activity. *See, e.g.*, *United States v. Blackwell*, 110 F.3d 65 (6th Cir. 1997) (unpublished table decision) (per curiam) (finding officer testimony that an unattached glove box was a sign of illegal drugs being concealed in the dash contributed to reasonable suspicion of criminal activity); *United States v. Mendez*, 118 F.3d 1426, 1432 (10th Cir. 1997) (finding crooked dashboard faceplate and dismounted radio contributed to reasonable suspicion of criminal activity); *United States v. Chaidez*, 906 F.2d 377, 384 (8th Cir. 1990) ("[A]n experienced law enforcement officer would know that drug couriers do not often leave their contraband 'strewn across the trunk or floor of a car' and that they frequently hide drugs beneath car seats or inside the cavities in a car's panels." (quoting *United States v. Ross*, 456 U.S. 798, 820 (1982))).

Signs that the vehicle's interior had been altered, in addition to other factors identified by the district court, comprised sufficient reasonable suspicion in this case to justify a brief detention while officers conducted a canine sniff. In conducting the sniff, which occurred from 14:04:52–14:06:33, during which Trooper Landers conducted the sniff while Trooper Jesse directed traffic, the troopers diligently pursued a means of investigation likely to confirm or dispel their suspicions quickly, and the length of time and intrusiveness of the stop as a whole (23 minutes to the point of the dog's alert) were reasonably related to the officers' reasonable articulable suspicion of criminal activity.

### III. Conclusion

For the reasons above, we **AFFIRM** the district court's denial of the motion to suppress.