**NOT RECOMMENDED FOR PUBLICATION**
File Name: 20a0352n.06

No. 19-6125

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**UNITED STATES OF AMERICA,**

        **Plaintiff-Appellee,**

v.

**JONATHAN MENDOZA-
RICARDO,**

        **Defendant-Appellant.**

**FILED**
Jun 15, 2020
DEBORAH S. HUNT, Clerk

**ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF
KENTUCKY**

**BEFORE:**    **CLAY, ROGERS, and DONALD, Circuit Judges.**

**CLAY, Circuit Judge.** Defendant Jonathan Mendoza-Ricardo appeals his criminal conviction after pleading guilty to a conspiracy to distribute large quantities of marijuana. *See* 21 U.S.C. §§ 841(a)(1), 846. On appeal, Mendoza-Ricardo challenges his detention at a traffic stop as unreasonable, and thereby seeks to suppress his later confession. For the reasons that follow, we disagree and affirm Mendoza-Ricardo's conviction.

## I. BACKGROUND

In early February 2019, Bryn Elton—a special agent with Homeland Security Investigations ("HSI")—was in Phoenix, Arizona, "conducting surveillance on a suspected narcotics trafficker." (Hearing Tr., R. 125 at PageID #397, #400–01.) While monitoring that suspected trafficker, Agent Elton and her colleagues saw him load what they suspected to be bales of marijuana into the back of a Toyota Highlander. They decided to follow the Highlander, the start of what turned into a two-day "trip from hell," in which the agents were led from state to state until finally arriving in Kentucky. (*Id.* at #401–02.)

When they reached the Lexington area, Elton says the vehicle performed a "countersurveillance run" in the parking lot of a shopping mall, after which it proceeded to a residence in Nicholasville, Kentucky, and backed into the driveway. (*Id.* at #402–03.) The HSI agents then set up surveillance around the house and began a stakeout. They also asked for support from local law enforcement, in case they needed uniformed officers to conduct a traffic stop or otherwise assist the agents with their work. One of the HSI agents, Matthew Hall, met with Nicholasville Police Department officers, informed them of the operation, and gave them a radio; the Nicholasville officers agreed to help if they could.

At one point during the stakeout, a white work truck arrived at the house. The two men in the truck exited the vehicle, took small, grocery-store-type plastic bags from the truck, and walked into the house without knocking. According to Elton, the house in question appeared to be a stash house, meaning a location used for storing drugs. Based on her experience and training, drug dealers will not allow third parties into a stash house, and so it is very likely that anyone entering the house was involved in the conspiracy.

After spending some time in the house, the two men returned to their truck and started to drive away. The car drove directly by Elton, who recognized the man sitting in the passenger seat as Fabian Zavala-Romero, an undocumented immigrant who was suspected of involvement in a large-scale narcotics operation in the Lexington area. At that point, Elton notified the team over the radio that Zavala-Romero was in the truck, and that the agents "had probable cause to stop and detain him for a minimum of those immigration violations, in addition to the suspected narcotics violations that were going on at that house." (*Id.* at #406.) Elton then heard officers and agents on the radio coordinating a traffic stop of the white truck.

Nicholasville officer Jeff Fryman, one of the officers who previously met with Agent Hall, heard over the radio that a white work truck had left the suspected stash house. He then saw a white truck near the location reported by the HSI agents and began to follow it under HSI's direction. Fryman says he recalls agents mentioning either one or two occupants of the vehicle, that "one of the men in the vehicle was at least one of the ones that they had been watching," and that one of the people in the vehicle was undocumented. (*Id.* at #424.) Fryman called for marked patrol units to come assist them with a potential traffic stop, and Agent Hall was also following behind Fryman but was caught in traffic.

Eventually, HSI directed Nicholasville police to stop the vehicle. According to Fryman, the stop was "[b]ased on [HSI's] investigation and the immigration status of one of the occupants." (*Id.* at #425.) Fryman says that officers then stopped the vehicle, spoke with its occupants, and detained both of them. The two people in the car were ultimately identified as Zavala-Romero— the man whom Agent Elton recognized earlier—and Jonathan Mendoza-Ricardo, the defendant in this appeal. Fryman also said that HSI suspected both occupants of the vehicle of involvement in the drug conspiracy, and specifically asked Fryman to detain both of them, not just Zavala-Romero.

While Agent Hall had earlier been following the Nicholasville officers, he never made it to the scene of the traffic stop. Instead, before he got there, he activated his emergency equipment and raced back to the house; Fryman believes this occurred after radio reports came in of a man at the stash house trying to flee through a window. Whatever the cause, the Nicholasville officers were left at the scene alone, which Fryman describes as follows:

> After we detained [Zavala-Romero and Mendoza-Ricardo], we
> pretty much didn't do anything. We waited. I can't remember if I
> talked on the cell phone or the radio to Special Agent Hall because

> he was the one we had the most conversation with or communication with. But he told us that somebody [else] from HSI was going to be coming to our traffic stop.

(*Id.* at #427–28.) Fryman says it took ten to fifteen minutes for this other agent to arrive at the scene, during which the officers were still trying to confirm the identities of Zavala-Romero and Mendoza-Ricardo.

In his testimony, Fryman also noted the Nicholasville officers' desire to wait for HSI to arrive so they could interview the pair themselves:

> Q. . . . [B]ased on your training and experience, you typically, if you're less familiar with the investigation, would you wait for [a different] officer to question suspects?
>
> A. A hundred percent.
>
> Q. That's just because they're more familiar with the facts?
>
> A. Exactly.

(*Id.* at #428.)

Meanwhile, back at the house, agents saw a man exit the home, open up the Highlander, and start moving black objects, which based on the surveillance in Phoenix, the agents believed were bales of marijuana. Elton testified that in her experience, once a shipment of drugs reaches a stash house, many other vehicles may soon arrive to pick up their share of the drugs, and so the time for the agents to act was shrinking. As a result, the agents decided to secure the house and moved in to surround it. When they did this, someone tried to jump out of a back window but returned into the house when he saw other agents. Officers called out for the occupants to surrender and exit the home, and eventually two men left the house and were taken into custody.

After the two men at the house were detained, HSI agent Brian Patterson, who was then at the house, was instructed to take his partner and go to the scene of the traffic stop instead.

According to Agent Elton, all of the events at the house occurred within approximately fifteen minutes, and Patterson too says he arrived at the traffic stop between fifteen and twenty minutes from the time that it started. After Patterson arrived, he introduced himself to the Nicholasville officers at the scene, reviewed some documents that the officers recovered, and began interviewing the two men from the truck.

Back at the house, one of the men who surrendered there, Fabian Noperi, had previously been identified as a suspected narcotics smuggler and was one of the individuals whom agents saw in the Highlander as it drove from Arizona to Kentucky. After he was Mirandized, Noperi admitted that there were narcotics and guns in the house, and told agents that the two occupants of the white work truck had left to get money to pay for the drugs. Agents at the house then told Patterson that the occupants of the white truck were part of the drug conspiracy and should continue to be detained. Consequently, the two were transported to the Nicholasville Police Department for further interviews.

Once at the police department, Mendoza-Ricardo admitted his involvement in the drug conspiracy. A federal grand jury then indicted him for conspiracy and possession with intent to distribute over 100 kilograms of marijuana.

Following the indictment, Mendoza-Ricardo moved to suppress the statements he made at the police station after his arrest. Mendoza-Ricardo admits that officers had adequate grounds to make the initial traffic stop of his vehicle, and that they had probable cause to arrest him at the time they took him back to the station.[1] But Mendoza-Ricardo claims that the traffic stop was unconstitutionally prolonged because the purpose of the stop was to arrest his passenger, Zavala-

---

[1] Mendoza-Ricardo initially argued that his arrest was not supported by probable cause, but he expressly abandoned that argument on appeal.

Romero, for his immigration violation. And since that arrest happened immediately after the traffic stop began, Mendoza-Ricardo says he should have been free to go. Instead, he was detained at the scene of the traffic stop until Agent Patterson arrived, at which point Mendoza-Ricardo was taken to the station house and arrested. Thus, Mendoza-Ricardo claims that his subsequent confession was a product of this unconstitutional detention, and so should be suppressed.

After holding a hearing, the district court denied Mendoza-Ricardo's motion. The district court found that officers had three purposes for stopping the white work truck: (1) to detain and question Zavala-Romero for his immigration violation, (2) to determine the identity of the vehicle's driver, since he was transporting Zavala-Romero, and (3) to question both of them about their suspected involvement in the drug conspiracy. On this last point, the court found that the agents had a reasonable suspicion that Mendoza-Ricardo was part of the drug conspiracy, and that this reasonable suspicion supported detaining him in order to question him about his activities at the suspected stash house. Because the total length of the traffic stop was approximately twenty-four minutes, because it took just over fifteen of those minutes for Patterson to arrive, and because officers were still searching the truck and attempting to confirm the passengers' identities during that period, the court held that the stop was not unconstitutionally prolonged.

After the district court denied his motion, Mendoza-Ricardo entered into a conditional plea agreement in which he reserved the right to challenge the district court's suppression ruling. The court then sentenced him to the mandatory minimum of five years' imprisonment. On appeal, Mendoza-Ricardo says that the district court erred in denying his suppression motion because the traffic stop was unconstitutionally prolonged.

## II. DISCUSSION

### A. Standard of Review

"When reviewing a district court's decision on a motion to suppress, we use a mixed standard of review: we review findings of fact for clear error and conclusions of law *de novo*." *United States v. Cochrane*, 702 F.3d 334, 340 (6th Cir. 2012) (quoting *United States v. See*, 574 F.3d 309, 313 (6th Cir. 2009)). Further, "[w]hen a district court has denied a motion to suppress, this Court reviews the evidence in the light most likely to support the district court's decision." *Id.* (quoting *United States v. Adams*, 583 F.3d 457, 463 (6th Cir. 2009)). The application of facts to the law, which in this case includes the question of whether the duration of the stop was permissible, is reviewed de novo. *United States v. Torres-Ramos*, 536 F.3d 542, 550 (6th Cir. 2008); *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002).

### B. Analysis

In this appeal, Mendoza-Ricardo argues that his detention at the traffic stop was unconstitutionally extended, requiring the suppression of statements he made to police after he was arrested at the end of the stop. According to Mendoza-Ricardo, the purpose of the traffic stop was to arrest his passenger, Zavala-Romero, for immigration violations, and so once officers completed that task, he should have been free to leave. But the record shows that HSI agents directed officers to stop the vehicle as part of their narcotics investigation, based on their suspicion that both occupants of the truck were involved in a drug trafficking conspiracy being run out of the suspected stash house. And while Mendoza-Ricardo also argues that the stop took too long because officers held him at the scene until Agent Patterson arrived, it was reasonable for officers to wait approximately fifteen minutes until a federal agent responsible for the case could arrive to interview the suspects. Accordingly, we must affirm Mendoza-Ricardo's conviction.

A traffic stop is usually "more akin to an investigative detention rather than a custodial arrest, and the principles announced in *Terry v. Ohio*, 392 U.S. 1 (1968), apply to define the scope of reasonable police conduct." *United States v. Davis*, 430 F.3d 345, 353 (6th Cir. 2005) (quoting *United States v. Bailey*, 302 F.3d 652, 657 (6th Cir. 2002)). Under that framework, "[a] temporary detention for questioning does not require a showing of probable cause if it is justified by specific and articulable facts that give rise to a reasonable suspicion of criminal activity." *United States v. Palomino*, 100 F.3d 446, 449 (6th Cir. 1996).

The Fourth Amendment inquiry for a *Terry* stop includes two related parts. First, the court must determine "whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to reasonable suspicion." *United States v. Garza*, 10 F.3d 1241, 1245 (6th Cir. 1993) (quoting *United States v. Hardnett*, 804 F.2d 353, 356 (6th Cir. 1986)). Second, the court must decide "whether the degree of intrusion . . . was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." *Id.* (quoting *Hardnett*, 804 F.2d at 356); *see also Davis*, 430 F.3d at 353 ("[A]ny subsequent detention after the initial stop must not be excessively intrusive in that the officer's actions must be reasonably related in scope to circumstances justifying the initial interference." (quoting *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999))); *Townsend*, 305 F.3d at 541 (same).

The first issue on appeal is the purpose of the traffic stop, and specifically whether that stop was performed in part to question Mendoza-Ricardo about his role at the suspected stash house. This is important because the purpose of the stop affects what length of detention is reasonable and what facts are considered when performing this analysis. *See Rodriguez v. United*

*States*, 575 U.S. 348, 354 (2015) ("Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' . . . ." (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)); *Torres-Ramos*, 536 F.3d at 550–51 (noting the scope of the traffic stop as a factor in the Fourth Amendment analysis).

The district court found that one of the purposes of the traffic stop was to question both Mendoza-Ricardo and Zavala-Romero about their involvement in the drug conspiracy. Mendoza-Ricardo objects to this finding and argues that the traffic stop was really focused on Zavala-Romero's immigration status, not on Mendoza-Ricardo's own suspected involvement in the drug conspiracy. But this misconstrues the witnesses' testimony, which confirms that the stop was made at HSI's direction and as part of their investigation of the suspected stash house. (*See* Hearing Tr., R. 125 at PageID #425 ("Q. And what was the basis of the stop? A. Their direction was to go ahead and make the stop. Q. Based on the immigration status? A. *Based on their investigation* and the immigration status of one of the occupants, yes." (emphasis added)); *id.* at #438 ("Q. Also, with respect to Mr. Mendoza, was it your understanding that the HSI agents did suspect him of being involved in the drug trafficking activity? A. Yes. Q. And they actually asked you to detain him as well? A. Correct.").) Even if there were some ambiguity in this testimony, the district court did not clearly err in finding that investigating Mendoza-Ricardo's involvement in the drug conspiracy was one of the purposes of the stop. This is particularly true given the context of this appeal, where we must construe the facts in the light most favorable to the government. *Cochrane*, 702 F.3d at 340.

To be sure, "[a] court cannot determine that an officer had reasonable suspicion on the basis of a factor on which the officer did not actually rely." *Townsend*, 305 F.3d at 541. But in this case, the Nicholasville officers stopped Mendoza-Ricardo at HSI's direction, which in turn

implicates the collective knowledge doctrine. Under that doctrine, "an officer may conduct a stop based on information obtained by fellow officers" rather than information the detaining officer herself possesses. *United States v. Lyons*, 687 F.3d 754, 765–66 (6th Cir. 2012). This doctrine applies "whenever a responding officer executes a stop at the request of an officer who possesses the facts necessary to establish reasonable suspicion," since in that case, the responding officer is effectively acting as the other officer's agent. *Id.* at 766; *see also id.* at 767 (outlining the scope of this doctrine). The record here shows that HSI directed officers to stop the work truck, and so HSI's purpose for making that request is the relevant question for our Fourth Amendment inquiry. Because that purpose included questioning the vehicle's occupants about their activities inside the suspected stash house, and because the agents had reasonable suspicion of that criminal activity, we proceed to assess whether the length of Mendoza-Ricardo's detention was reasonable in light of that purpose.

While reasonable suspicion can support stopping a vehicle for the purpose of investigating non-traffic criminal activity, *see, e.g.*, *United States v. Arvizu*, 534 U.S. 266, 271–72, 277–78 (2002), the subsequent detention must still be reasonable under the Fourth Amendment. "Although an officer may have reasonable suspicion to detain a person or his possessions for investigation, the officer's investigative detention can mature into an arrest or seizure if it occurs over an unreasonable period of time or under unreasonable circumstances." *United States v. Avery*, 137 F.3d 343, 349 (6th Cir. 1997). Thus, "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Rodriguez*, 575 U.S. at 350; *accord, e.g.*, *Miller v. Maddox*, 866 F.3d 386, 393–94 (6th Cir. 2017).

In making this assessment, we look to whether the detention was (1) sufficiently limited in time and (2) involved the least intrusive means that were reasonably available. *Davis*, 430 F.3d at 354. Thus, "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion). This means that the police must have "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686 (1985); *accord, e.g.*, *Hoover v. Walsh*, 682 F.3d 481, 497–98 (6th Cir. 2012); *Davis*, 430 F.3d at 356–57. Furthermore, "[o]nce the purpose of the initial traffic stop is completed, an officer cannot further detain the vehicle or its occupants unless something happened *during the stop*" that provides additional reasonable suspicion. *Davis*, 430 F.3d at 353; *accord, e.g.*, *Torres-Ramos*, 536 F.3d at 550.

In this case, the record shows that after Mendoza-Ricardo was detained, he was held at the scene of the traffic stop for approximately fifteen minutes until Agent Patterson could arrive. Officer Fryman testified that this delay was necessary so that HSI agents could be the ones who questioned Mendoza-Ricardo, since they were the ones who had knowledge of the facts of the case.

There were clear benefits to allowing federal agents—who directed the stop and were responsible for the investigation—to question these suspects instead of officers who were just informed of the investigation earlier that same day. And in the face of suspected narcotics trafficking, this Court has routinely upheld detentions longer than the one at issue here for a drug-sniffing dog to arrive. *See, e.g.*, *United States v. Perez*, 440 F.3d 363, 367–69, 372–73 (6th Cir. 2006) (approximately one hour); *Davis*, 430 F.3d at 354–55 (approximately thirty minutes). Mendoza-Ricardo does not explain why a delay for an agent to arrive is meaningfully different,

and in fact, he never addresses in his briefing on appeal why waiting fifteen minutes for Agent Patterson was unreasonable. The length and manner of this delay were "reasonably related in scope to the circumstances which justified the interference in the first place"—namely, HSI agents' suspicion of Mendoza-Ricardo's involvement in drug trafficking—and so the brief wait for Agent Patterson to arrive does not offend the Fourth Amendment. *Terry*, 392 U.S. at 19–20.

Mendoza-Ricardo also argues that upholding the stop in this case would allow open-ended detentions for as long as officers need in order to conduct an interview, but the Supreme Court is clear that a *Terry* stop is only permissible until its purposes either "are—*or reasonably should have been*—completed." *Rodriguez*, 575 U.S. at 354 (emphasis added); *see also Sharpe*, 470 U.S. at 685 ("Obviously, if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop."). And so, while an extended delay waiting for Agent Patterson to arrive at the scene might have violated the Fourth Amendment because Mendoza-Ricardo's interview "reasonably should have been" completed sooner, *Rodriguez*, 575 U.S. at 354, the approximately fifteen-minute wait at issue here falls well short of that goalpost. This is especially true when considering the events at the suspected stash house, which required HSI to pull Agent Hall off his route to the traffic stop to help secure the scene. *See Perez*, 440 F.3d at 372–74 (holding that investigation activity at another location can support a continued detention following a *Terry* stop).

### III. CONCLUSION

While Mendoza-Ricardo argues that the purpose of his traffic stop was completed as soon as officers arrested his passenger, the record shows that a key purpose of the stop was to question Mendoza-Ricardo regarding his activities at the suspected stash house. Having one of the HSI agents responsible for that investigation question him was reasonably related to that purpose, and

the delay of approximately fifteen minutes needed for this to happen was not unreasonable under the circumstances. Accordingly, the officers' detention of Mendoza-Ricardo did not violate the Fourth Amendment, and so we affirm his conviction.