UNITED STATES of America,
Plaintiff,

v.

**Corey Anthony GOSS, Richard Dwayne Perry, Darrell Henderson Stanfield, and Andre Nadell Davis, Defendant.**

**No. 1:11–cr–187.**

United States District Court,
W.D. Michigan,
Southern Division.

Feb. 8, 2012.

Mark V. Courtade, U.S. Attorney, Grand Rapids, MI, for Plaintiff.

## OPINION AND ORDER DENYING DEFENDANTS' JOINT MOTION TO SUPPRESS

PAUL L. MALONEY, Chief Judge.

This matter comes before the Court on Defendants' Joint Motion to Suppress.[1] (ECF No. 65.) The Government filed its response. (ECF No. 71.) An evidentiary hearing on the motion occurred on December 16, 2011. The parties have submitted

---

1. All four defendants are listed in the motion and counsel for all four defendants electronically signed the motion and brief. At the outset of the hearing, counsel for Defendant Andre Davis, appearing by telephone, withdrew from the motion.

post-hearing briefs. (ECF Nos. 87 and 88.)

Early in the morning on April 6, 2011, circa 5:30 a.m., Defendants Corey Goss, Richard Perry, and Darrell Stanfield (collectively "Defendants") were pulled over for a traffic stop in Chambers County, Texas, east of Houston on I-10. During the traffic stop, Texas Department of Public Safety Trooper Kevin James,("Trooper James"), a 16 year veteran, due to a constellation of circumstances, became suspicious of Defendants' activity and requested a canine unit come to his location. Prior to the arrival of the canine unit, all three Defendants consented to a search of the vehicle. Eventually, more than ten kilograms of narcotics were recovered. Defendants jointly filed this motion to suppress.

Reviewing the motion, the Court finds four issues are presented. First, Did the trooper have probable cause to believe a traffic violation had occurred? Second, was the scope and duration of the traffic stop reasonable? Third, did the trooper have reasonable suspicion to extend the traffic stop beyond its original purpose? Finally, was the search of the van valid? Because the Court answers each of these questions affirmatively, Defendants' motion to suppress is DENIED.

## FACTUAL BACKGROUND

Trooper James was driving a patrol car equipped with audio and video recording equipment. The events that occurred in front of Trooper James's patrol car are captured on video. The audio recording of the events are limited to sound that occurred immediately around Trooper James, who was wearing a microphone on his belt. The parties have submitted a nearly two-hour recording of the traffic stop.

Early in the morning on Wednesday, April 6, 2011, Defendants, residents of Lansing, Michigan, were driving east along I-10 in Chambers County, Texas, east of Houston. Defendants were in a 2002 Chevrolet conversion van with a Michigan license plate. Trooper James had just released a vehicle from a traffic stop. At the hearing, Trooper James testified that through observation while returning to his squad car and using his mirrors once inside, he observed the headlights of Defendants' van driving in the far left (inner) lane for more than an eighth of a mile. Trooper James explained that he had an unobstructed view of Defendants' vehicle as this stretch of the interstate is long, straight, and flat, as are large sections of the State of Texas. The video shows that, as Trooper James entered the highway in the far right lane, he is passed by a tractor-trailer truck in the center lane and Defendants' van in the far left lane. The illumination (or lack thereof) of the license plate on Defendants' van is a contested issue between the parties.

Trooper James quickly caught up to the two vehicles. He passed the tractor-trailer truck using the right lane. He then pulls his vehicle into the far left lane, presumably in front of the van. The van is next observed on the video using the center lane to pass Trooper James on the right. The license plate remained visible. Trooper James moves behind the van in the center lane. The van then pulled into the right lane and then onto the shoulder, followed by Trooper James.

Around 5:24 a.m., Trooper James radioed dispatch stating that he has affected a traffic stop and that the vehicle has a defective license plate light. Trooper James gave another reason for the stop. Although dispatch spoke over him, Trooper James can be heard referencing lane violations. Exiting his patrol vehicle, Trooper James approached the van on the passenger side and greeted individuals in

the van. He asked for the driver's license and insurance. Trooper James then asked the driver, Darrell Stanfield, to exit the vehicle to show him why he was pulled over. Before Stanfield exited the vehicle, Trooper James asked the individuals in the van a few questions. The individuals told Trooper James they were from Michigan, had come to Houston for the NCAA Basketball Tournament, and they were rooting for Butler, one of the "Final Four" teams.[2] Trooper James then moved to the rear of the van to wait for Stanfield. As Stanfield walked down the left side of the van, before standing next to Trooper James, Stanfield volunteered "I know we have a short in the light back there." Trooper James responded "when I stopped you it was on and when you passed it wasn't." Trooper James also told Stanfield to stay out of the inside lane, which is for passing only. At the hearing, Trooper James testified that the licence plate light was never on and that the light appears to be lit on the video because the reflective paint on the license plate makes the plate glow.

After discussing the reason for the stop, Trooper James asked Stanfield questions about the trip. Stanfield told Trooper James that the group got tickets to the basketball games through Stanfield's uncle. Stanfield explained that the tickets were about $200 each, that he paid for the tickets, and that all three men went to the game. Trooper James asked Stanfield how many games they attended, and specifically if they just went to the games on Saturday, or if they also went to the championship game on Monday. Stanfield responded that they went to the game on Saturday and did not go to the game on

Monday because Butler had lost.[3] Trooper James told Stanfield that Butler did not lose until Monday. Stanfield replied, "you right. I forgot about that." Trooper James then told Stanfield to wait.

Trooper James again approached the van on the passenger side. He asked the two men in the van for their identification. Trooper James asked the passengers questions about their trip. The questions he poses are audible, but the answers are not. Trooper James attempted to get the passengers to speak up, but their answers could not be clearly heard on the audio recording. Trooper James asked the passengers questions similar to those he asked Stanfield, such as how much the basketball tickets were, who paid for the tickets, and who went to the game. Trooper James also asked the passengers if they had any criminal history. Corey Goss admitted he had a prior arrest for a DWI.

Trooper James then returned to the rear of the van to talk with Stanfield. He again asked Stanfield who went to the game. This time Stanfield contradicted himself stating that he and Richard Perry went to the game, but Corey Goss did not go to the game. Instead, Goss stayed at Stanfield's uncle's house.

Trooper James returned to his patrol car and radioed the identification information to dispatch. Trooper James also spoke out loud, likely for the benefit of the audio recording. He outlined inconsistencies in the answers he received from Stanfield and the answers he received from the passengers that remained in the van. Trooper James stated that Stanfield was

2. The NCAA Mens Final Four was held in Houston, Texas at Reliant Stadium. The semi–finals occurred on Saturday, April 2, 2011. The finals were held on Monday, April 4, 2011. The final four teams were Butler University, the University of Connecticut, the University of Kentucky, and Virginia Commonwealth University.

3. Butler beat Virginia Commonwealth in the first semi-final game on Saturday. Butler advanced to the finals, where they lost to Connecticut.

rooting for Butler and that Stanfield said he lost interest when Butler lost in the semi-finals. Trooper James noted that Butler won their semi-final game and lost in the finals. Trooper James stated Stanfield and the passengers gave inconsistent stories about who paid for the tickets and how much the tickets cost. Trooper James also noted that Stanfield and the passengers gave inconsistent stories concerning who went to the game.

After five minutes in the patrol car, Trooper James returned to Stanfield. Stanfield informed Trooper James that, yesterday, he was able to lift the cover of the light to tap it. Trooper James stated that he was only issuing a warning, not a citation. This statement occurred approximately ten to eleven minutes after the van was pulled over. Trooper James then left Stanfield and approached the van on the passenger side. He returned the passengers' identification. He asked the two men in the van where they stayed. The passengers indicated they stayed in a hotel. Trooper James asked how much the hotel cost and whether everyone stayed together. Trooper James returned to Stanfield briefly and then returned to his patrol car to get the criminal histories from dispatch. Dispatch informed Trooper James that Goss had both felony arrests and convictions, not just a DWI. Trooper James returned to Stanfield and asked him to clarify where everyone stayed, in a hotel or with his uncle. Stanfield replied that they stayed in a hotel and one night he stayed with his uncle.

Trooper James then asked who owned the van. Stanfield responded that the van was owned by Andre Miller. Trooper James asked Stanfield for permission to search the van. Stanfield hesitated, explaining that the van was not his. Trooper James pointed out several inconsistencies between Stanfield's answers and the answers provided by the two men in the van

and again asks for consent to search the van. Stanfield stated he would not consent to a search of the van. Trooper James moved off-camera to speak with what sounds like another officer, explaining that no consent to search was given and that there are two more people in the van. Trooper James is heard speaking to dispatch, stating that no consent to search was given and requesting a canine unit. This occurs between fifteen and sixteen minutes after the van pulled over.

Trooper James returned again to the van. He asked the passengers to exit the van. As each exits the van, he is patted down. When the second passenger, Perry, exited the van, Trooper James determined that Perry is related to Andre Miller, the registered owner of the van. Trooper James requested consent to search the vehicle. Perry's response is not clearly audible. However, the parties concede that Perry consented to a search of the van. Goss and Perry joined Stanfield at the rear of the vehicle.

About nine minutes later, Trooper James engages the three men. He explained that he has a canine unit en route. This conversation occurred about twenty-five minutes after the van was pulled over. Trooper James and other officers can be seen looking in the van with their flashlights through the open door. On the audio recording, the officers can be heard talking about visible seams in the vehicle's interior where someone may have taken panels of the interior apart and then put them back together.

Minutes later, Defendants can be seen talking to each other, although no audio recording of their conversation is available. They get the attention of one of the officers who is now on the scene. That officer approached the van and told Trooper James that the men would like to consent

to search. Trooper James can be heard saying that they will have to wait.

After another five minutes, Trooper James returned to the three men and asked what they wanted. One of the three is heard asking whether things would go faster if they consented to a search. After some discussion, Trooper James asked if they would consent to a search. Although the words are not clearly audible, all three men can be seen nodding their heads. Trooper James stated that consent should not be given just to expedite things. He tells the men that its either yes or no. Again, the three men appear to nod their heads. The officers then enter the vehicle and begin searching. This occurs approximately thirty-seven minutes after the van was pulled over.

The canine unit arrives approximately twelve minutes later, somewhere around fifty-five minutes after the van was pulled over and around forty minutes after Trooper James requested a dog. The dog and the handler can be seen walking around the van, although the two are not visible the entire time. About five or six minutes after their arrival, the handler, without the dog, walks to the open van door and someone is heard saying "he alerted."

Approximately one hour and forty minutes after the van was pulled over and approximately one hour after consent to search the van was given, the officers discovered the narcotics.

## ANALYSIS

In their motion, Defendants analyze the traffic stop by identifying eleven stages and assert reasons to suppress the evidence at each stage. The Government contends the traffic stop was proper and that Trooper James had reasonable suspicion to extend the traffic stop beyond its original purpose.

The Court opts not to follow Defendants' approach to the traffic stop. As will be further explained, the reasonableness of the stop must be evaluated under the totality of the circumstances. Breaking the stop into eleven stages and analyzing each stage for potential violations does not view the stop under the totality of the circumstances standard. *See United States v. Hill,* 195 F.3d 258, 269–70 (6th Cir.1999) ("To accept Defendants' position that Deputy Whitlock purposefully tailored the stop to draw out its duration would require the Court to view the stop not under the totality of the circumstances but, rather, in an unreasonable piecemeal fashion so as to draw a brightline limitation as to an officer's course and conduct during a stop.").

## A. ISSUE ONE—PROBABLE CAUSE FOR A TRAFFIC STOP

For the purposes of the Fourth Amendment, a traffic stop constitutes a seizure of the driver and any passengers in a vehicle. *Brendlin v. California,* 551 U.S. 249, 257–58, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007); *United States v. Campbell,* 549 F.3d 364, 371 (6th Cir.2008). Therefore, both the driver and the passengers, in this case all three Defendants, may challenge the legality of the stop. *See Campbell,* 549 F.3d at 371. The Government bears the burden of establishing the existence of probable cause to conduct a traffic stop. *See United States v. Beal,* 810 F.2d 574, 577 (6th Cir.1987). An officer has probable cause when the facts and circumstances within the officer's knowledge, based on "reasonably trustworthy information, are sufficient to warrant a man of reasonable caution to believe that an offense has been or is being committed." *United States v. Davis,* 430 F.3d 345, 352 (6th Cir.2005) (citing *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925)); *see United States v. Ferguson,* 8 F.3d 385, 392 (6th Cir.1993)

(en banc) ("Probable cause is defined as 'reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.'" (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir.1990))). The permissibility of a traffic stop turns on whether probable cause is supported by objective facts; the officer's subjective intent is irrelevant. *United States v. Hughes*, 606 F.3d 311, 315 (6th Cir.2010) (citing *Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996)). Whether probable cause existed at the time of the stop "is fact-dependant and will turn on what the officer knew *at the time he made the stop.*" *Ferguson*, 8 F.3d at 391 (emphasis in original). The existence of probable cause must be determined on the totality of the circumstances. *Id.* at 392 (citing *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).

■ A police officer may stop a vehicle when the officer has probable cause to believe a traffic violation has occurred. *United States v. Blair*, 524 F.3d 740, 748 (6th Cir.2008) (distinguishing between probable cause to stop a vehicle for a civil infraction and reasonable suspicion of an ongoing crime to stop a vehicle for a criminal infraction (citing *Gaddis v. Redford Twp.*, 364 F.3d 763, 771 n. 6 (6th Cir. 2004))); *see Whren*, 517 U.S. at 809, 116 S.Ct. 1769; *United States v. Street*, 614 F.3d 228, 232 (6th Cir.2010) ("When law enforcement officers witness a traffic violation, they may stop the driver and his car."). "[S]o long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting traffic stop is not unlawful and does not violate the Fourth Amendment." *Ferguson*, 8 F.3d at 391; *see Davis*, 430 F.3d at 352 (citing *United States v. Bradshaw*, 102 F.3d 204, 210 (6th Cir.1996)). However, any evidence seized during an illegal traffic stop must be suppressed as "fruits of the poisonous tree." *Hill*, 195 F.3d at 264 (quoting *Wong Sun v. United States*, 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)).

■ In Texas, drivers generally must drive on the right side of the roadway, unless he or she is passing another vehicle. *Texas Transp. Code Ann.* § 545.051(a). When an officer observes a driver violating § 545.051(a), the officer has cause justifying a traffic stop. *Crawford v. Texas Dep't of Pub. Safety*, No. 03–10–00070–CV, 2011 WL 2437687, at *3 (Tex.Ct.App. June 16, 2011). Probable cause to effect a traffic stop will not be undermined on the basis of an officer's mistake of fact, if that mistake is reasonable. *United States v. Payne*, 534 F.3d 948, 951 (8th Cir.2008); *United States v. Dowthard*, 500 F.3d 567, 569 (7th Cir.2007); *United States v. Arias*, 213 Fed.Appx. 230, 232–33 (4th Cir.2007) (per curiam) (citing *United States v. Chanthasouxat*, 342 F.3d 1271, 1276 (11th Cir. 2003) and *United States v. Cashman*, 216 F.3d 582, 587 (7th Cir.2000)).

■ Trooper James testified that he observed the van driven by Stanfield driving in the left lane for approximately one-eighth to one-quarter of a mile. He had returned to his patrol car after completing the previous traffic stop. The released vehicle had pulled away onto the highway. Trooper James would have had adequate time to observe the traffic behind him. Defendants argue the video contradicts Trooper James's testimony. The video neither confirms nor contradicts Trooper James's observations. The video only recorded what occurred in front of the patrol car, not what occurred behind the patrol car. When the van first appears in the video, it is in the far left (inner) lane, consistent with Trooper James's testimony. A tractor-trailer truck occupies the center lane. In their brief, Defendants argue they were passing the truck, and therefore were allowed to use the left lane.

Trooper James testified that the truck was ahead of the van and the truck had slowed down as it approached the patrol car with its emergency lights illuminated, making it appear as though Defendants were passing the truck. Defendants have offered no testimony or other evidence to contradict or otherwise call Trooper James's testimony into question. Trooper James has almost sixteen years experience with the Department of Public Safety. He is very familiar with the area, having patrolled that portion of I–10 for years. The Court finds Trooper James both professional and credible. Trooper James informed Stanfield that one of the reasons the van was pulled over was because he was driving in the left lane. As noted above, the Trooper said as much to dispatch in his first report of the stop before *any* contact with defendants. Accordingly, the Court finds Trooper James had probable cause to conduct a traffic stop on the van driven by Stanfield for not driving in the appropriate lane. Having reached this conclusion, the Court need not resolve whether the rear license plate was properly illuminated.

### B. ISSUE 2—SCOPE AND DURATION OF THE TRAFFIC STOP

[redacted] The United States Supreme Court described the duration and scope of a legitimate traffic stop.

> A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation. The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop. Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave. An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not controvert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop.

*Arizona v. Johnson,* 555 U.S. 323, 333, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009) (internal citations and citations omitted). A seizure justified solely for the purpose of issuing a traffic citation "can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes,* 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005); *see Davis,* 430 F.3d at 353 (explaining that probable cause for a traffic stop, unlike probable cause to believe that a criminal violation has occurred, does not allow the police to detain individuals indefinitely). Therefore, a court must endeavor to determine when a traffic stop ends and the further detention of the driver and any passengers begins. *United States v. Torres–Ramos,* 536 F.3d 542, 550 (6th Cir.2008). The proper inquiry is whether the vehicle was "detained longer than reasonably necessary for the Officers to complete the purpose of the traffic stop." *United States v. Bell,* 555 F.3d 535, 541 (6th Cir.2009).

[redacted] A police officer may ask the driver of a vehicle to exit the vehicle that has been stopped for a traffic violation. *Pennsylvania v. Mimms,* 434 U.S. 106, 111, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977). The officer may also ask any passengers to exit a vehicle that has been stopped for a traffic violation. *Maryland v. Wilson,* 519 U.S. 408, 414–15, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997). During the course of a traffic stop, the officer may request drivers' licenses and registration, may run a computer check on the papers, and may issue a citation without exceeding the scope of the traffic stop. *United States v. Bonilla,* 357 Fed.Appx. 693, 696 (6th Cir. 2009). The officer may ask the driver and passengers questions that are unrelated to the traffic stop, so long as the questions do not unreasonably extend the traffic stop beyond its original purpose. *United*

*States v. Everett*, 601 F.3d 484, 492 (6th Cir.2010).

In attempting to answer the question of how much prolongation of a traffic stop is unreasonable, the court provided the following guidance.

> [B]ecause the touchstone of any Fourth Amendment analysis is reasonableness, we must conduct a fact-bound, context-dependent inquiry in each case. Furthermore, we conclude that it would be inappropriate to merely evaluate the reasonableness of the *interval of prolongation* in isolation. Instead, the proper inquiry is whether the "totality of the circumstances surrounding the stop" indicates that the duration of *the stop as a whole*—including any prolongation due to suspicionless unrelated questioning— was reasonable.

*Id.* at 493–494 (emphasis in original) (citations omitted). The Sixth Circuit has explained that "the overarching consideration is *the officer's diligence.*" *Id.* at 495. Generally, questions about the driver's travel history and travel plans and his or her authority to operate the vehicle "will rarely suggest a lack of diligence." *Id.* However, "if the totality of the circumstances, viewed objectively, establishes that the officer, without reasonable suspicion, definitively abandoned the prosecution of the traffic stop and embarked on another sustained course of investigation, this would surely bespeak a lack of diligence." *Id.*

 The facts and circumstances here support the conclusion that the duration of the traffic stop was reasonable. The Court finds that the traffic stop ended when Stanfield refused to consent to a search.[4] The traffic stop lasted approximately fifteen to sixteen minutes from the time the van was pulled over. *E.g. United States v. Marsh*, 443 Fed.Appx. 941, 943–44 (6th Cir.2011) (holding that a traffic stop lasting fifteen minutes was not longer than necessary to complete the purpose of the stop); *United States v. Jimenez*, 446 Fed.Appx. 771, 774–75, 2011 WL 5966507, at *3 (6th Cir.2011) (finding a fifteen minute traffic stop was reasonable). During this time, Trooper James asked appropriate questions about the passengers' travel history and travel plans, he asked the driver to exit the vehicle, he secured the identifications of Defendants and ran a criminal history check on them, he received the criminal history results for Defendants from dispatch, and he appeared to write out the warning. Trooper James's conduct, at all times, was diligent in pursuing the purpose of the traffic stop. *See Bell*, 555 F.3d at 541 (holding that, as part of a traffic stop, an officer may detain the driver of a vehicle until the officer has received radio checks and has issued a citation because those activities " 'would be well within the bounds of the initial stop.' " (quoting *United States v. Wellman*, 185 F.3d 651, 656 (6th Cir.1999))). When Trooper James asked Stanfield for consent to search the van, Stanfield informed Trooper James that the van was not his, and eventually refused to consent to a search. At that point, the purpose of the traffic stop was complete. From that point forward, Trooper James's interaction with Defendants changed. He approaches the situation as though he suspects that criminal activity is afoot.

## C. ISSUE 3—REASONABLE SUSPICION TO EXTEND THE TRAFFIC STOP

 "Once the purpose of the initial traffic stop is completed, an officer cannot

---

4. At the hearing, Trooper James testified that the traffic stop was not over at this point because he had not fully completed his interviews. The Government admits that, after Stanfield refuses consent to a search, Trooper James began conducting himself as though he had reasonable suspicion.

# 881

further detain the vehicle or its occupants unless something happened *during the stop* to cause the officer to have a 'reasonable and articulable suspicion that criminal activity [is] afoot.'" *Davis,* 430 F.3d at 353; *see United States v. Smith,* 601 F.3d 530, 542 (6th Cir.2010); *Torres–Ramos,* 536 F.3d at 550. If an individual is held after the purpose of a traffic stop has been completed, the principles in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) apply. *Everett,* 601 F.3d at 488 (citing *Hill,* 195 F.3d at 264). A *Terry* stop "permits a police officer to briefly detain a person or property for investigative purposes if the officer has reasonable suspicion, supported by articulable facts, that criminal activity has occurred or is about to occur." *Davis,* 430 F.3d at 354 (citing *Farm Labor Org. Comm. v. Ohio State Highway Patrol,* 308 F.3d 523, 543–44 (6th Cir.2002)).

In analyzing the constitutionality of a *Terry* stop, a court conducts a two-step analysis of the reasonableness of the stop. *Davis,* 430 F.3d at 354. First, the court must determine if there was a proper basis for the stop, "which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which give rise to reasonable suspicion." *Id.* (citing *United States v. Garza,* 10 F.3d 1241, 1245 (6th Cir.1993)). A reasonable level of suspicion requires, objectively, something more than a gut feeling or hunch, but the level of proof is considerably less than proof of wrongdoing by a preponderance of the evidence and also less than that required for probable cause. *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). A court should consider the totality of the circumstances to determine the reasonableness of the investigatory stop. *Davis,* 430 F.3d at 354.

■ While "ill-defined hunches" cannot support reasonable suspicion, officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person". *U.S. v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002), cited in *U.S. v. Perez,* 440 F.3d 363, 371 (6th Cir.2006).

■ If the *Terry* stop was proper, the court must then determine if the degree of intrusion was reasonably related to the scope of the situation. *Davis,* 430 F.3d at 354 (quoting *Garza,* 10 F.3d at 1245). Under this second step of the analysis, the court should consider whether (1) the stop was sufficiently limited in time, and (2) the investigative means used were the least intrusive means reasonably available. *Id.* (quoting *Bennett v. City of Eastpointe,* 410 F.3d 810, 825–26 (6th Cir.2005)). *Terry* does not impose any rigid time limitation on the duration of lawful stop. *Id.* at 355 (citing *United States v. Orsolini,* 300 F.3d 724, 730 (6th Cir.2002)).

*Smith* presented a situation similar to what occurred here. *Smith* involved a large drug conspiracy that grew out of a drug organization based in Detroit, Michigan. One defendant, Brian Garrett, filed a motion to suppress prior to trial. Garrett was a passenger in a car driving through Texas when the car was stopped for speeding. The officer requested identification from the driver and Garrett, and asked the driver to accompany him to the patrol car. While in the patrol car, the driver indicated that the two were in a borrowed car, were driving to Amarillo, Texas, to visit a friend, but could not provide an address for the friend and gave contradictory statements about when the friend moved to Amarillo. The officer then approached Garrett, who stated that they were going to California to visit relatives. After issuing the warning, the officer requested consent to search the car, which was granted.

The officer eventually found over $700,000 in currency stashed in several hidden compartments.

Garrett asserted that the officer unreasonably extended the duration of the stop. The court concluded the officer had reasonable suspicion to believe criminal activity was occurring and therefore the extension of the traffic stop was justified. *Smith*, 601 F.3d at 542. The court found that the officer had reasonable suspicion to leave the driver in the vehicle and ask Garrett questions based on five factors: (1) the car was being driven through a known drug corridor, (2) the car was owned by a third party, (3) the driver provided an implausible story about her destination, (4) the driver contradicted herself, and (5) Garrett's identification came back as a false number. *Id.*

The Sixth Circuit has had multiple opportunities to consider whether inconsistent stories offered to a police officer during the course of a traffic stop gives rise to reasonable suspicion that criminal activity is afoot. Inconsistencies in the answers provided by a driver and passengers, when viewed in the totality of the circumstances, can give rise to reasonable suspicion. *See Orsolini*, 300 F.3d at 727–29; *Hill*, 195 F.3d at 270–72.[5] However, under other circumstances, such inconsistencies do not give rise to reasonable suspicion. *See United States v. Richardson*, 385 F.3d 625, 630–31 (6th Cir.2004); *United States v. Townsend*, 305 F.3d 537, 541–45 (6th Cir. 2002); *United States v. Mamoth*, 113 F.3d 1236, 1997 WL 215511, at *5 (6th Cir. Apr.

29, 1997) (unpublished table opinion); *United States v. Mesa*, 62 F.3d 159, 163 (6th Cir.1995).

In *Orsolini*, a male driver with a female passenger were pulled over for speeding in Tennessee. After talking with the driver, the officer returned to his patrol car and, while writing a citation, called for assistance. A second officer arrived some ten minutes later and talked with the first officer for some two to three minutes. The second officer then began to question the driver and passenger. The first officer issued the driver a citation for speeding and told the driver he was free to leave. Just as the driver was preparing to drive away, the second officer asked the driver if there was anything illegal in the car and whether the driver would permit the officers to search the car. The driver became very nervous, but initially consented to the search. When the officers asked the individuals in the car to stand down the road, the driver withdrew his consent. The district court listed, as the basis for reasonable suspicion, six factors: (1) recent purchase of the vehicle with cash in a source city for drugs, (2) inconsistent stories about where and why Orsolini had been in Texas, (3) inconsistent stories from the driver and passenger about whom they were going to visit, (4) inconsistent stories about the nature of the relationship between the driver and passenger, (5) how Orsolini became nervous when he was asked for consent to search the vehicle, and (6) the subsequent revocation of consent to search. Although the district court

---

5. The Government also cites *United States v. Erwin*, 155 F.3d 818 (6th Cir.1998) (en banc) and *Weaver v. Shadoan*, 340 F.3d 398, 408 (6th Cir.2003). Neither case helps the Government's position. (Govt. Br. 13.) The Government does not provide a pinpoint citation for *Erwin*. In *Erwin*, neither the district court nor the circuit court identified inconsistencies in answers as a basis for reasonable suspicion under the totality of the circum-

stances. *See Erwin*, 155 F.3d at 825–26 and 828. *Weaver* is a qualified immunity case. The Government cites *Weaver* for the proposition that "lying about travel plans can form a basis for reasonable suspicion." In *Weaver*, the court found the officer had reasonable suspicion under the totality of the circumstances, including one of eight factors that Weaver's alleged travel plans "were inconsistent with his current location". *Id.*

concluded the officers did not have reasonable suspicion, the circuit court found otherwise. *Orsolini*, 300 F.3d at 728. The circuit court found the district court erred because it considered the factors in isolation. *Id.* In addition, the circuit court found that the district court failed to take into account other observations of the officers: (1) that the driver's only proof of identification was a photocopy of an interim license issued by the state of California, (2) the initial officer found curious that the luggage was in the back seat rather than the trunk, and (3) there were piles of clothes in the car and various food bags and food wrappers on the floorboards suggesting the two were traveling without stopping. *Id.* at 728–29. The court concluded "[n]one of these individual circumstances is sufficient by itself to create a reasonable suspicion of criminal activity, but when combined with the six factors that the district court did consider, we believe that they are sufficient to support a reasonable suspicion." *Id.* at 729.

In *Hill*, the officer stopped a U–Haul truck because the vehicle was traveling sixty-two miles per hour on a road where the posted speed was fifty-five miles per hour. The driver's license was verified as valid before a canine search was executed. The district court relied on eight factors as providing reasonable suspicion: (1) the unusual explanation for the cross-country trip, (2) the defendants' inconsistent responses regarding their itinerary, (3) the possibility that one or more of the defendants was using cocaine based on the inordinate number of used tissues on the floorboard, and (4) the defendants exhibited nervous behavior during the stop. *Hill*, 195 F.3d at 271. The circuit court affirmed, finding the officer had reasonable suspicion to extend the traffic stop. *Id.* at 272. Specifically, the circuit court pointed to the defendants' implausible explanation for the trip, the inconsistent stories regarding the defendants' itinerary, and the

excessive tissues on the floorboard of the vehicle. *Id.* Defendants told the officer that their sister was in the military and she had been relocated. Defendants explained that they were moving her stuff. In the officer's experience, the military moves the belongings of its people when they are relocated. In addition, one person said they were going to drop off the stuff and leave, while the other said they were going to stay a few days. One person said their sister had flown out a month beforehand and the other said their sister had helped them load the truck.

In *Richardson*, a police officer observed a vehicle recklessly swerving between two tractor-trailer trucks on the interstate. The officer stopped the vehicle for following too closely. The officer asked the driver for his license and observed that all four people in the car appeared nervous; the driver was shaking and the passenger dumped the contents of her purse on the floorboard while looking for her license. One passenger indicated that they had been to Nashville to see a lawyer. Later, the driver indicated that they had been to Nashville to see a doctor. While the officer and the driver were talking outside the car, one of the passengers moved into the driver's seat. In order to extend the traffic stop beyond its original purpose, the government identified three facts: (1) nervous behavior by the driver and passengers, (2) allegedly conflicting explanations of travel plans, and (3) the passenger's move to the driver's seat. Both the district court and the circuit court concluded those facts were insufficient to create reasonable suspicion. *Richardson*, 385 F.3d at 630–31. ("Under the totality of the circumstances, the factors upon which the United States relies do not add up to a reasonable suspicion of criminal activity.").

In *Townsend*, the police officer stopped a car early in the morning for speeding.

After talking with the individuals in the car, the officer asked everyone to exit the car, and then patted each down. The officer also searched the passenger compartment for weapons, but did not find any. The officer then had everyone wait for thirty minutes until a canine unit arrived. Although no drugs were found, the officer did eventually locate ten counterfeit one-hundred dollar bills stashed in the trunk in a compact disc changer. Both the district court and the circuit court concluded the officer did not have reasonable suspicion to prolong the traffic stop after its original purpose had been completed. *Townsend,* 305 F.3d at 541–545. Both courts examined some ten factors. First, the driver exhibited unusual behavior when he raised his hand in the air when the officer approached the car and he was unusually cooperative. *Id.* at 542. Both courts found this factor to be a weak indicator of criminal conduct. *Id.* at 542–43.

The second and third factors were based on the stories provided by the individuals in the car. Second, the officer found defendants' travel plans were dubious because the driver could not recall his sister's address and the car would have arrived at its destination between 4 and 5 a.m. *Id.* at 543. The circuit court distinguished its facts from those in *Hill. Id.* Unlike the situation in *Hill,* the plausibility of the story was not a concern, people do travel to see their relatives and late-night travel is not inherently suspicious. *Id.* The circuit court concluded that the stories did not have the "indicia of untruthfulness" that would arouse suspicions. *Id.* Third, the officer found the departure and destination cities to be suspicious. The officer believed Chicago to be a source city for narcotics and Columbus to be a destination city for narcotics. Both courts concluded the officer's suspicions based on the departure and destination did not merit the suspicion the officer attached. *Id.*

The fourth and fifth factors were based on items the officer observed in the car. Fourth, the officer observed three cell-phones in the vehicle and concluded that was typical of drug couriers. The district court found that cell phones are more prevalent than they were in 1992, when cell phones were considered tools of the drug trade. *Id.* at 544. The circuit court found that the presence of three cell phones was odd, but the factor was weak and was not accompanied by more substantially suspicious factors. *Id.* Fifth, the officer notices a Bible in the car and thought that it was suspicious because drug couriers often display religious items to deflect suspicion. The district court concluded this was a weak factor and the circuit court agreed. *Id.*

Sixth, when the officer frisked the defendants, he felt what appeared to be a roll of currency. The district and circuit courts concluded that the record did not reflect the amount of money found and therefore the factor was not probative of criminal activity. *Id.* Seventh, the officer pointed out that he discovered from the defendant's criminal history that the defendant had an earlier weapons charge. The circuit court agreed that this was a factor that entitled the officers to search the passengers and passenger compartment. *Id.* However, the officers did just that and nothing was found. *Id.* at 544–45. Eight, the officers claimed the defendants appeared nervous. The district court found the officers' testimony on this point lacked credibility and the circuit court did not find any error in the district court's finding. *Id.* at 545. Ninth, the officers testified that the car was cluttered with food wrappers and clothing, indicative of individuals who are reluctant to leave their vehicle, like drug couriers. The circuit court found this factor not to be terribly suspicious as the defendants would not have had to live in their car for several

days to travel from Chicago to Columbus. *Id.* Finally, tenth, the officers testified that the driver was not the registered owner of the vehicle, which is often true for drug couriers. The circuit court noted that the car was registered to the defendant's mother, which made the suspiciousness of this factor "comparatively weak." *Id.*

In *Mamoth,* an officer pulled over a motor home with an out-of-state license plate at 3:00 a.m. after observing the motor home change lanes without using a turn signal. The driver produced an identification card, but not a driver's license. The officer issued a courtesy citation approximately five minutes later, but detained the individuals for another fifty minutes. The officer identified several reasons for the delay. First, the officer detained the driver in order to verify that the driver had a valid license. The circuit court concluded that the record did not support the officer. *Mamoth,* at *5. The dispatcher's tape recordings show the officer never radioed and the officer was not carrying a cell phone that night. *Id.* The officer testified that he was suspicious because the individuals in the car gave him inconsistent stories as to their destination. The circuit court concluded that this factor did not create reasonable suspicion because the officer neither testified why the alleged inconsistencies led him to believe the defendants were involved in criminal activity nor explained the significance of the destinations in his calculations. *Id.*

In *Mesa,* an officer stopped a car for speeding. In the car with the driver was the driver's sister and the sister's two children. The driver exited the car to retrieve her driver's license from the trunk. Rather than returning to the car,

the officer directed the driver to sit in the back seat of the patrol car. The officer informed the driver that he would issue a warning for speeding and proceeded to ask her a number of questions. The driver indicated they were going to Nashville to see her grandfather, who had suffered a stroke. Because the car was registered to the driver's sister, the officer returned to the car to retrieve the registration. The sister also indicated they were going to Nashville to visit her grandfather, but denied that the grandfather had suffered a heart attack. The officer returned to the patrol car and issued the driver a written warning. The officer, however, did not let the driver out of the patrol car. Instead, the officer began asking the driver questions unrelated to the purpose of the stop. The officer asked if he could look in the car, to which the driver consented. The officer had a canine unit with him and circled the car with the dog, but the dog did not alert. By this time, other officers arrived on the scene and three officers proceeded to search the vehicle. No contraband was discovered. The officers ordered the sister and two children to join the driver in the back seat of the patrol car. The officers removed all the luggage from the trunk. They discovered a partition in the trunk, but did not see anything in the partition. The three officers were eventually able to pry open the partition, where they discovered both cocaine and loaded handguns.

The court concluded the officers did not have reasonable suspicion to detain the defendants after the purpose of the traffic stop had been completed. *Mesa,* 62 F.3d at 163.[6] The Government offered three reasons why the officers had reasonable

6. For the purpose of obtaining consent after the conclusion of a traffic stop, Mesa has subsequently been confined to its facts. *See United States v. Guimond,* 116 F.3d 166, 171 (6th Cir.1997). *Guimond* does not affect

Mesa with regard to the issue of reasonable suspicion. *United States v. Burton,* 334 F.3d 514, 518 (6th Cir.2003); *United States v. Smith,* 263 F.3d 571, 589 n. 5 (6th Cir.2001).

suspicion to extend the traffic stop beyond its original purpose: (1) one sister said the grandfather lived in Kingsport and the other sister said the grandfather lived in Nashville, (2) one sister said the grandfather had a stroke and the other sister denied that the grandfather suffered a heart attack, and (3) the defendant appeared nervous. The circuit court quickly dismissed the first two reasons. *Id.* at 162. Defendant denied telling the officer that her grandfather lived in Kingsport and the court concluded that the recording of the stop supported the defendant driver's assertion. *Id.* The court concluded the discrepancy between the two sister's stories about their grandfather's health was "simply not a discrepancy sufficient to generate suspicion in the mind of a reasonable police officer." *Id.* The court concluded the defendant's nervousness was normal because she was not issued a citation and was locked in the patrol car for "a considerable period of time." *Id.* at 163.

■ If an officer has reasonable suspicion to suspect that criminal activity is afoot, the officer may reasonably delay the vehicle and its occupants in order to allow a canine unit to perform a sniff. *United States v. Perez*, 440 F.3d 363, 373 (6th Cir.2006) (involving a one-hour delay that was found reasonable); *Davis*, 430 F.3d at 354 (involving a detention of 35 to 45 minutes to wait for a drug dog that was found not unreasonable); *Orsolini*, 300 F.3d at 730 (involving a 50 minute delay, that was found reasonable, including 35 minutes spent arranging for a canine unit). The court looks to the totality of the circumstances to determine whether the delay was reasonable.

■ The facts and circumstances presented to Trooper James provide reasonable suspicion to detain the vehicle after the traffic stop ended. When the traffic stop is over, Trooper James was aware of specific and articulable facts providing reasonable suspicion that criminal activity was afoot. Individually, none of the factors might give rise to reasonable suspicion. However, when taken together, under the totality of the circumstances, Trooper James had a basis for extending the traffic stop and further detaining Defendants. *See Perez*, 440 F.3d at 371 ("In considering the totality of the circumstances, 'we must determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately.'" (quoting *United States v. Smith*, 263 F.3d 571, 588 (6th Cir.2001))).

First, Stanfield's recollection of the basketball games they attended was highly suspect as an innocent explanation for presence in the Houston, Texas area. Ordinarily, someone who drives more than 1200 miles to watch the Final Four of the NCAA basketball tournament would have more than a passing interest in the game and certainly accurate knowledge of the result *vis-a-vis* the team defendant said he was rooting for (Butler). The Final Four is the pinnacle of the NCAA basketball season. The team he was allegedly following won, not lost, their the semi-final matchup, a game Stanfield claimed to have attended. Even a casual fan would likely have recalled if his or her team won or lost. The utter implausibility of Stanfield's explanation is similar to the implausibility of the defendants' explanations of the purpose of their trip in *Hill*.

Second, Trooper James testified that I–10 is a known drug highway.[7] *See Robinson v. Texas*, 174 S.W.3d 320, 329 (Tx.Ct. App.2005) (noting that the corridor be-

---

7. The Government also cites *United States v. Avendano–Sanchez*, No. EP–07–CR–979–DB, 2007 WL 2572047, at *3–*4 (W.D.Tex. Aug. 28, 2007). That opinion, and the two cases cited in that opinion in footnote 6, involve the portion of I–10 near and around El Paso, on the west side of Texas, some 675 miles away from Houston. Given the distance and prox-

tween Houston and Mississippi was "a major cocaine distribution point"). Courts have recognized that I–10 has been used for drug trafficking and that such knowledge may be relied upon by officers in finding reasonable suspicion to prolong a traffic stop. *E.g. Williams v. Texas,* No. 01–08–00936–CR, 2010 WL 2220586, *5 (Tx. Ct.App. June 3, 2010). In addition, Houston is a destination city for the purchase of narcotics, which are then trafficked east. *See United States v. Chavis,* 902 F.Supp. 111, 114 (E.D.Tex.1995); *Gipson v. Texas,* 14–01–00760–CR, 2002 WL 31318610, at *3 (Tex.Ct.App. Oct. 17, 2002).

Additional factors support the conclusion that reasonable suspicion existed. Third, Stanfield and the two passengers provided inconsistent answers to the questions posed by Trooper James.[8] Stanfield initially said that all three men went to the game. Perry told Trooper James that he did not attend the game. Stanfield and the passengers provided Trooper James with different prices for the game tickets.[9] These inconsistencies strike the Court as more significant than the inconsistencies in *Townsend, Mamoth,* and *Mesa.* Fourth, Stanfield informed Trooper James that the van was owned by an individual who was not in the van, Andre Miller. *See Smith,* 601 F.3d at 542; *United States v. Jackson,*

235 Fed.Appx. 707, 711 (10th Cir.2007) (holding that ownership of a vehicle by a third party is a factor supporting a finding that reasonable suspicion existed to extend a traffic stop).

Trooper James had reasonable suspicion that Defendants were not telling him the truth and that Defendants were involved in criminal activity. The implausibility of Defendants' stories as it related to their interest in the basketball games as the *raison d'etre* why they were in Texas and the inconsistencies in their stories about the trip generally suggested to Trooper James that Defendants were not telling him the truth. Trooper James's knowledge of I–10 as a drug corridor to points east which would include the state of residency of each occupant and his discovery that the van was not owned by any individual in the van alerted him as a trained law enforcement officer to the possibility that Defendants were involved in criminal activity.

Having found that the first prong in *Terry* was met, the Court moves to the second prong, whether Trooper James's conduct was reasonably related in scope to the justification for the continuing detention. As indicated above, Trooper James had reasonable suspicion that criminal activity was afoot and suspected specifically

---

imity to Mexico along that portion of I–10, *Avendano–Sanchez* is not particularly useful.

8. Defendants argue that these inconsistencies involve facts unrelated to criminal matters and, therefore, are not indicators of any illegal activity. Where courts have found that inconsistent stories, combined with other factors, have given rise to reasonable suspicion, those courts have not required the inconsistencies to be related to illegal activities. *E.g., Smith,* 601 F.3d at 542 (inconsistencies in stories about future travel plans); *Orsolini,* 300 F.3d at 727–29 (inconsistencies in stories about past events); *Hill,* 195 F.3d at 270–72 (implausible story about past events). Inconsistent stories give rise to reasonable suspi-

cion, not because the inconsistencies relate to criminal activity, but because they are indicators that the individuals are trying to hide something by not telling the truth.

9. Defendants argue that the inconsistencies arose from events in the past, rather than future plans. While factually accurate, the legal significance of the observation is somewhat illusory. Defendants have offered no legal authority suggesting that forgetting what occurred in the past would not create reasonable suspicion, while forgetting future plans would create reasonable suspicion. To the extent that courts have examined one situation or the other, this Court is unaware of any opinion comparing the two situations.

that drug contraband was in the van. Here, the facts support the conclusion that the length of the detention was reasonable. Within minutes of the end of the traffic stop and the initiation of the *Terry* stop, Defendant Perry consented to a search of the vehicle. Within 20 minutes of the end of the traffic stop, all three Defendants consented to a search of the vehicle. Defendants complaint that the *Terry* stop lasted unreasonably long is difficult to rationalize when Defendants authorized the officers to search the vehicle. With consent to search the van, the officers were entitled to do just that. Furthermore, within thirty-five minutes of the end of the traffic stop, the canine unit arrived. *See Davis*, 430 F.3d at 354 (finding that the a 30 to 45 minute wait for a canine unit was reasonable because the police had reasonable suspicion to detain the defendant beyond the purpose of the initial traffic stop). In addition, the intrusiveness of the *Terry* stop was reasonable. Defendants were asked to wait between the van and the patrol car. Although they were monitored by officers, they were not handcuffed.

## D. ISSUE 4—SEARCH OF THE VEHICLE

■ A search based upon the consent of an individual may occur without a warrant or probable cause and evidence found and seized during that search is admissible at trial. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

It is well-established that a warrantless search by law enforcement officials will be upheld if a detainee has voluntarily consented to the search. The government has the burden of demonstrating that consent was "freely and voluntarily given," and was not the result of coercion, duress, or submission to a claim of authority. The proper analysis for determining the voluntariness of a detainee's consent is to consider "the totality of the circumstances" of the alleged consent. It is not necessary that the police inform the detainee that he or she has the right to refuse consent, but instead, such lack of warning of the detainee's right to refuse will be considered under the totality of circumstances analysis. *United States v. Van Shutters*, 163 F.3d 331, 335 (6th Cir.1998) (internal citations and citations omitted).

All three Defendants voluntarily consented to a search of the van, before the officers searched the van. Within minutes of the end of the traffic stop, Defendant Perry consented to a search of the van. After Stanfield refused to consent to a search, Trooper James engaged the passengers and ordered them to exit the van. When Defendant Perry exited the van, Trooper James determined that Perry was related to Andre Davis, the owner of the van. After informing him that Stanfield did not consent, Trooper James asked for and received consent to search the van from Perry. That Defendant Perry's consent was voluntary is not challenged by Defendants. Trooper James explained to Perry that Stanfield had refused to consent. There is no indication that Defendant Perry was coerced or under duress. The entire detention had lasted less than twenty minutes at this point. Defendant Perry had been asked to leave the van and had been patted down, but was not in handcuffs and was not under arrest.

Rather than immediately conducting a search of the vehicle, Trooper James opted to wait for the canine unit to arrive. Trooper James explained at the hearing that because Stanfield had refused to consent, Trooper James was under the impression that any evidence found in the van could not be used against Stanfield.[10]

10. Because all three Defendants later consented to a search, the Court need not resolve

Before the canine unit arrived, on their own accord, Defendants sought the officers and asked whether they could still consent to a search. Trooper James explained to them that they should not consent simply to move things along. All three Defendants affirmatively consented to a search of the van. In their brief, Defendants argue the consent provided was not voluntary because they had been illegally detained. The Court has already concluded that the initial traffic stop was valid and that reasonable suspicion existed to further detain Defendants after the traffic stop's purpose had been completed.

Defendants offer three other arguments against the search. First, they argue that the search of the van went too far. Defendants reason that the police were not entitled to dismantle the van. Second, Defendants argue that they withdrew their consent. Third, Defendants argue the dog's alert is not seen on the video recording. These arguments are not persuasive. Trooper James testified that he and the other officers observed scratches along panels in the van and, in the area between the driver and passenger seats and, in the ceiling of the front of the cab, screws that had been cut in half and were not holding anything in place. Those observations led the officers to concentrate their efforts on those areas. He also testified that, as the vehicle was searched, the officers found numerous voids that ran the length of the vehicle behind custom wood panels. Trooper James further testified that the officers were thorough and methodical, but did not demolish the interior of the van. He admitted that the officers did not put back together the wood panels that ran along the passenger side. He also admitted that there was damage to the front roof area where the compartment containing the narcotics was found. Defendants

this issue.

offer no evidence to counter this testimony.

Defendants' assertion that they withdrew consent is not supported by the record. Trooper James testified that at no point did Defendants attempt to revoke their consent to the search. At the hearing, defense counsel asked several times about a statement allegedly made by Stanfield that he would not have consented if he knew the officers were going to dismantle the van. No such statement is heard on the recording. Even if such a statement was made, the statement is not a revocation of consent. At best, Stanfield is expressing regret for consenting, but the statement does not indicate that he wants the officers to stop searching because he is withdrawing his consent.

Defendants' contention that the dog's alert cannot be seen on camera does not undermine the conclusion that the dog alerted. The Court finds Sergeant Gary Almeida, the dog handler, credible on this issue. Sergeant Almeida testified the dog alerted at the back of the van, near the front on the driver's side, and also inside the van. Sergeant Almeida testified that the dog's alert was passive. From the position of the patrol car's camera, two of the three alerts would not be visible on the video recording. A positive canine sniff provides probable cause to search a vehicle. *Perez*, 440 F.3d at 374. Given that a thirty-five to forty minute wait for a canine unit is reasonable, once reasonable suspicion has been established, even absent consent the officers would have eventually secured probable cause to search the van. Trooper James testified that had any Defendant revoked consent, he would have ended his search of the van and simply waited for the dog to arrive.

890

Based on this discussion, the search of the van was valid. Defendants consented to the search. Had Defendants not consented, the officers would have waited for the dog, which alerted to the presence of drugs. Had Defendants revoked consent, the officers would also have waited for the dog, which alerted to the presence of drugs. Under each scenario, the officers were validly searching the vehicle when they located the drugs. Given the undisputed consent, the only scenario under which the search was not valid was if Defendants revoked consent and the dog did not alert. The undisputed testimony on the record refutes both of those possibilities. Defendants have put forth no evidence to contradict the conclusion that consent was not revoked and that the dog did not alert.

## CONCLUSION

Defendants' motion to suppress is DENIED. The Government has established probable cause for the traffic stop. The van was being driven in the passing lane. The scope and duration of the traffic stop was reasonable. The traffic stop lasted between fifteen and sixteen minutes. The Government has established that Trooper James had reasonable suspicion to extend the traffic stop after its purpose had been completed. The van was traveling east from Houston along a known drug corridor, Defendants' recollection of their purpose for being in Houston was riddled with inconsistencies and implausibilities, the van was owned by a third party not in the van, and Defendant Goss lied about his criminal history. Finally, the search of the van was valid. Defendants consented to the search and, when it arrived, the dog alerted to the presence of drugs.

## ORDER

For the reasons provided in the accompanying opinion, Defendants' motion to suppress (ECF No. 65) is **DENIED. IT IS SO ORDERED.**